**NORTHROP CORPORATION,**
**Plaintiff/Appellant/Cross-Appellee,**

v.

**McDONNELL DOUGLAS**
**CORPORATION,**
**Defendant/Appellee/Cross-Appellant.**

Nos. 81–5165, 81–5172.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 1, 1982.

Decided Feb. 28, 1983.

As Amended May 9, 1983.

1034

George L. Hecker, Cave, McPheeters & McRoberts, Los Angeles, Cal., for McDonnell Douglas Corp.

John W. Chierichella, Eldon H. Crowell, Crowell & Moring, Washington, D.C., for Northrop Corp.

Before POOLE and BOOCHEVER, Circuit Judges, and SOLOMON,* Senior District Judge.

BOOCHEVER, Circuit Judge:

This appeal and cross-appeal present complex issues concerning the extent to which private parties may obtain redress for alleged injuries occurring in the heavily regulated military aircraft industry. The principal issues are whether: (1) suit against the Government pursuant to 22 U.S.C. § 2356 (disclosure of proprietary data) is the exclusive remedy; (2) the Government is a necessary party; (3) the claims present non-justiciable political or foreign policy questions;

* Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

1035

(4) certain agreements between the parties are *per se* illegal restraints of trade; and (5) the Government so pervades the relevant market that no trade or commerce exists for Sherman Act purposes.

The case arises out of a series of "teaming" agreements that Northrop and McDonnell Douglas ("McDonnell") entered into at the Government's request to develop military aircraft. The agreements allegedly limited Northrop to marketing those aircraft developed through the teaming effort that were suitable for land-based operation and McDonnell to marketing those suitable for aircraft-carrier operation. Despite its extensive involvement in the military aircraft industry, the Government is not a formal party to either the agreements or this action.

The trouble giving rise to Northrop's complaint and McDonnell's counterclaim began when McDonnell was awarded a large Navy contract, Northrop lost the competition for a similar Air Force contract, and McDonnell subsequently began marketing land-based aircraft to foreign countries. Northrop contends that McDonnell's marketing of land-based aircraft violated the agreements. It filed suit claiming, *inter alia,* fraud, breach of contract, economic coercion, refusal to deal, unfair competition, and industrial espionage. McDonnell subsequently filed a counterclaim seeking, *inter alia,* a declaration of rights under the agreements and damages for Northrop's allegedly illegal conduct and breaches of the agreements.

After some preliminary procedural maneuvering, the district court dismissed Northrop's first amended complaint in its entirety and, alternatively, granted McDonnell summary judgment as to five of the eight counts in the complaint. *Northrop Corp. v. McDonnell Douglas Corp.,* 498 F.Supp. 1112 (C.D.Cal.1980). The district court also dismissed McDonnell's counterclaim and, alternatively, granted Northrop summary judgment on the ground that the counterclaim was the "mirror image" of Northrop's complaint.

We conclude that dismissal and summary judgment were inappropriate as to Northrop's complaint and McDonnell's counterclaim. Accordingly, except for the denial of a motion to modify a finding of fact, which we affirm, the decision of the district court is reversed and the matter remanded for further proceedings.

## I

## Background

### A. Facts

Between 1965 and 1972 Northrop devoted substantial resources toward developing a lightweight, moderately priced, multi-mission jet fighter. This development effort produced an aircraft design Northrop termed the P–530.

In 1972, the United States Air Force awarded Northrop a multi-million dollar contract to produce two prototype aircraft (designated the "YF–17") based generally on the P–530 design. The Air Force concurrently awarded a similar contract to General Dynamics Corporation to produce two prototypes based on an alternative design concept (designated the "YF–16"). Both contracts were awarded as part of the Air Force's Air Combat Fighter ("ACF") competition for prototype development of lightweight land-based fighters. In keeping with its usual procurement policy (*see generally* Armed Services Procurement Regulations ["ASPR"], 32 C.F.R. §§ 7–104.-9, 9–201(d), and 9–202.2(b) (1981)), the Government obtained unlimited rights through the contracts in the technology incorporated in the YF–16 and YF–17 prototypes.

McDonnell did not compete for an ACF contract. Instead, McDonnell concentrated on improving its F–15 design, which was for a more specialized and expensive land-based fighter than the YF–16 and YF–17 designs.

In 1974, the United States Navy announced the Navy Air Combat Fighter ("NACF") competition to develop a lightweight fighter suitable for aircraft carriers. To cut costs, Congress directed the Navy to

make maximum use of the technology already developed and paid for in the Air Force's ACF program. The Navy was thereby forced to limit its NACF competition to proposals based on General Dynamics's YF–16 and Northrop's YF–17 technology. Because of the headstart possessed by General Dynamics and Northrop in this technology and the limited funds the Navy had available to compensate other companies for the expense of catching up, the NACF competition was effectively limited to General Dynamics and Northrop.

Although General Dynamics and Northrop were essentially the only NACF competitors, neither possessed significant experience in producing carrier-suitable aircraft. To overcome this shortcoming, the Defense Department and Navy urged them to "team"[1] with companies having greater Navy experience. McDonnell was one of three or four companies that possessed the requisite Navy experience. Although, as noted by the district court, the parties dispute who was the pursuer and who the pursued,[2] the outcome of the corporate courtship is clear. On October 2, 1974, Northrop and McDonnell executed a "Teaming Agreement" to develop and propose variants of the YF–17 to the Air Force and Navy.

The Teaming Agreement was the first of three major written agreements between the parties. The parties agreed that Northrop would concentrate on the Air Force's ACF competition while McDonnell concentrated on the Navy's NACF competition. The proposal submitted to the Air Force listed Northrop as prime contractor and McDonnell as associate contractor; the roles were reversed in the proposal submitted to the Navy. The Agreement was intended "to be the basis for later agreements to be definitized."

On January 14, 1975, Northrop's YF–17 lost the ACF competition to General Dynamics's YF–16. On May 2, 1975, the Navy announced that McDonnell's proposed fighter had won the NACF competition, designating the winning design the "F–18". Approximately two months later, the parties entered into a "Basic Agreement" drawn along the same lines as the prior Teaming Agreement.[3] The Basic Agreement has five key provisions:

1. In the "Definition" clause, the F–18 is defined as "a carrier-based derivative of [Northrop's] YF–17 aircraft...."

2. In the "Objective" clause, the parties expressed their commitment to:

> work together (without in any manner intending to create a joint venture or otherwise incur or imply joint or several liability) for the purpose of obtaining and performing contracts for the development and production of derivatives of [Northrop's] YF–17 aircraft that are responsive to the requirements of the U.S. Navy and foreign customers.

3. In the "Contract Responsibilities" clause that is at the heart of this dispute, the parties agreed:

> 3. (a) ... that [McDonnell] will be prime contractor in connection with

---

1. In teaming arrangements, often used in large military projects, two or more private contractors pool their financial and technological resources to work on a project they would be unable to handle alone. *See Experimental Engineering v. United Technologies Corp.,* 614 F.2d 1244, 1245 (9th Cir.1980).

2. *See* 498 F.Supp. at 1115. The record supports the district court's view that Northrop and McDonnell "desperately needed each other if they—jointly and severally—were to succeed in tapping the great potential of the opportunity presented by the Navy's need for a new aircraft...." *Id.* For instance, a McDonnell executive noted in an internal memorandum that a teaming agreement:

> was the only crap game in town, so we had to play it.... The Navy wasn't going to let us propose our own airplane and win with it, so we had to go this way.

Similarly, although both parties make extravagant claims about their respective contributions to the eventual teaming effort, it seems clear that neither party would have gotten far without the other.

3. Both the Teaming and Basic Agreements were drafted in apparent accordance with ASPR 32 C.F.R. § 4–117 (1981) (authorizing "contractor team arrangements"). The Government was not a party to either agreement.

contracts with the U.S. Navy for the development of the F–18 and for the production of those F–18 aircraft purchased by the U.S. Navy for its own use. Furthermore, in the event a foreign customer desires to procure from [McDonnell] ... F–18 aircraft of basically the same configuration ... [McDonnell] will be prime contractor....

(b) [Northrop] may elect to be prime contractor on any or all contracts for the development and production of aircraft derived from the [Northrop] YF–17 other than those referred to in paragraph (a) above.

(emphasis added). The parties dispute whether the underscored phrase "of basically the same configuration" limits McDonnell to providing only carrier-suitable derivatives of the F–18.

4. The "Data Exchange" clause mutually obligates the parties to exchange available information on the F–18 and YF–17 technology. Pursuant to this clause, the exchanged technology "may be used by the receiving party only in furtherance of the contracts referred to in paragraph 3...."[4]

5. The "Division of Effort" clause provides that, absent a contrary Navy directive, all F–18 production was to be performed according to the distribution of labor specified by the parties in the agreement (see the "Workshare" discussion, infra, at § III).

The Government subsequently awarded McDonnell a prime contract for over $1.06 billion to make the F–18 operational. McDonnell, in turn, awarded Northrop the principal subcontract for the project. Under the prime contract, the Government paid McDonnell for interim design activities not covered by prior contracts. This payment was "flowed down" to the subcontract, reimbursing Northrop for its previously unfunded interim design work. Both

the prime contract and subcontract granted the Government unlimited rights in F–18 technology and incorporated by reference an addendum (No. 438 to MIL–D–8706) that authorized the use and submission of any YF–17 technology found applicable to the F–18.

In late 1975 and early 1976, Iran commenced negotiations with Northrop to become the first customer of a YF–17 derivative land-based fighter. Northrop's land-based derivative was designated the F–18L; McDonnell's Navy design had become known by this time as the F–18A. Concerned that Northrop's sales of F–18L fighters to Iran might undermine its F–18A program, the Navy persuaded the parties to enter a new agreement on August 26, 1976.

The August 26, 1976 Agreement essentially reaffirms the Basic Agreement, but contains a more explicit provision regarding the type of fighter Northrop could develop and market. The August 26th Agreement provided that Northrop "has elected to design, develop and produce for sale to the United States and to foreign governments all aircraft designed only for land-based operations which are derived from the YF–17."[5] Northrop's agreement to limit its F–18L production to land-based aircraft assured the Navy that Northrop's efforts would not interfere with McDonnell's completion of the carrier-suitable F–18A. The August Agreement also satisfied the Navy's demand that the parties agree upon a Foreign Military Sales Master Plan pursuant to Defense Department Directive 5105.38M.

### B. Procedural Posture

Northrop initiated the present action on October 26, 1979. In its first amended complaint, Northrop alleged that McDonnell has waged a deliberate campaign to monopolize the market for YF–17 derivative aircraft by crippling Northrop as a viable competitor. Although Northrop attacked on a broad front, its numerous allegations gener-

---

**4.** The parties sharply dispute whether this clause reflects a "license" of technology, or is merely a new teaming arrangement consistent with ASPR 32 C.F.R. § 4–117 (1981).

**5.** The August 26th Agreement expressly provided that McDonnell's rights under the Basic Agreement were left unchanged.

ally related to one of four main theories of wrongful conduct on the part of McDonnell.[6] First, McDonnell allegedly delayed production of all F–18 derivatives, including Northrop's F–18L, in order to promote sales of its own land-based F–15 in the interim. Second, McDonnell allegedly attempted to restrict Northrop's F–18L to a specialized class of limited-use fighters known as "day fighters" so that McDonnell's F–15 and F–18A fighters would be more attractive to customers desiring multi-mission aircraft. Third, McDonnell allegedly breached its obligations under the Basic Agreement to exchange F–18 technology and to subcontract the specified share of work to Northrop on F–18A aircraft sold in foreign countries. Finally, McDonnell allegedly breached paragraph 3 of the Basic Agreement by representing to foreign customers, particularly Israel, that McDonnell could serve as prime contractor on any version of the F–18, including a land-based version. McDonnell subsequently filed its counterclaim.

**6.** The relief sought by Northrop in the first amended complaint may be summarized as follows:

*Count One*—injunctive relief to prevent McDonnell from misappropriating Northrop's property by breaching the Agreements.

*Count Two*—injunctive relief to prevent McDonnell from misappropriating Northrop's property by exceeding the "license" of technology granted under the Agreements.

*Count Three*—a declaration of the parties' rights under the Agreements.

*Count Four*—damages for fraud by McDonnell in the inducement to enter the Agreements.

*Count Five*—an accounting for profits earned by McDonnell as a result of its breaches of the Agreements.

*Count Six*—injunctive relief and damages for McDonnell's alleged attempt to monopolize the domestic and foreign markets for F–18's in violation of section 2 of the Sherman Act.

*Count Seven*—injunctive relief and damages for McDonnell's acts of unfair competition.

*Count Eight*—recovery in *quantum meruit* for contributions to the joint business relationship for which Northrop has not been compensated.

**6a.** We discern no merit in McDonnell's contention that Northrop has abandoned the claims in counts 4–8 of its complaint by not explicitly challenging the district court's rulings that Northrop could not show injury in fact and failed to allege an unlawful combination. The two rulings are found in the order drafted for the court by McDonnell, but are not mentioned in

## II

### Dismissal of Northrop's Claims

The district court dismissed Northrop's complaint for (A) lack of subject matter jurisdiction; (B) failure to join an indispensable party—the United States; and (C) failure to state a claim because of non-justiciable political and foreign policy questions. Northrop challenges each of these determinations on direct appeal (No. 81–5165).[6a]

### A. Subject Matter Jurisdiction: Exclusivity of 22 U.S.C. § 2356

The district court held that the "Government's clear agency in [Foreign Military] sales [FMS] and its, at least putative, agency relationship in the licensing of commercial sales permissible only in the best interest of United States foreign policy can only be clarified in an action brought pursuant to 22 U.S.C. § 2356."[7] 498 F.Supp. at 1119.

the court's findings or opinion. Our review of the findings and opinion demonstrate that, notwithstanding the inconsistent language in its order, the court considered itself precluded from examining the injury issue by the political question and act of state doctrines. The application of those doctrines has been challenged on appeal. Northrop's discussion in its Opening Brief of the evidence of an unlawful combination suffices to preserve the claim.

The conduct and relief at issue in counts 4–8 overlap and are inextricably intertwined with that in counts 1–3. We decline to seize upon the variance between the district court's order and its findings and opinion to effect an abandonment of claims, particularly given that the evidence relevant to the allegedly abandoned claims is so similar to that underlying the other claims that must be tried on remand in any event.

**7.** 22 U.S.C. § 2356 (1976) waives sovereign immunity for claims within its scope, and provides that:

(a) Whenever, in connection with the furnishing of assistance under this chapter—

(1) * * *

(2) information, which is (A) protected by law, . . . . , is disclosed by the United States Government or any of its officers, employees, or agents in violation of such restrictions, the exclusive remedy of the owner . . . is to sue the United States Government for reasonable and entire compensation for

It then dismissed the entire complaint for lack of jurisdiction,[8] because § 2356 makes suit against the United States the exclusive remedy. Northrop argues that its claims do not involve McDonnell's disclosures but rather, *inter alia,* fraud, breach of contract, and attempt to monopolize, none of which are within the statute. McDonnell characterizes misuse and misappropriation as the *sine qua non* of all of Northrop's claims, states that those are within the statute, and argues that it was the Government's agent in using the information.

■ Section 2356, on its face, does not encompass Northrop's claims for fraud, breach of contract, attempt to monopolize, or anything else not pertaining to disclosure of proprietary information.[9] Moreover, even if, *arguendo,* misuse and misappropriation were the *sine qua non* of such claims, McDonnell's alleged misuse and misappropriations are not covered by the statute because, as discussed below, it is not an agent of the Government.[10]

Because at least some of Northrop's claims can arguably be construed as challenging McDonnell's disclosure of proprietary data, it is appropriate to consider whether McDonnell is the Government's "agent" within the meaning of § 2356 in disclosing information to potential foreign buyers. In addressing this question it is

important to note that there are principally two types of foreign sales—FMS sales and commercial sales. Commercial sales are distinguishable from FMS sales in that:

> [C]ommercial sales are made directly between a private contractor and a foreign country; the sale does not go through the government-to-government channels which foreign military sales go through. Consequently, the FMS rules do not apply to commercial sales. Although not a party to the sale, the government plays a substantial role inasmuch as a contractor must obtain an export license before it can conclude a commercial sale.

Scherzer, Janik and Green, *Foreign Military Sales: A Guide to the United States Bureaucracy,* 13 Geo.Wash.J. of Int'l L. & Econ. 545, 555 (1979).

■ Neither the district court nor the parties have offered any explicit guidance regarding the extent to which the disclosure claims, if any, pertain to FMS rather than commercial sales. We leave that question for resolution on remand. To the extent that any disclosure claims involve FMS sales, § 2356 is the exclusive remedy. Northrop does not challenge that position. To the extent, however, that any disclosure claims involve commercial sales, § 2356 is inapplicable.[11]

such practice or disclosure in ... district court ... or in the Court of Claims....

8. The court denied McDonnell's motion to dismiss with respect to 10 U.S.C. § 2273 (1976) and 28 U.S.C. §§ 1346(a)(2) and 1491 (1980). 498 F.Supp. at 1119–20. McDonnell has not cross-appealed that denial.

9. In reviewing a dismissal for lack of subject matter jurisdiction, we review the pleadings and evidence in the light most favorable to plaintiff. *See Western Waste Service Systems v. Universal Waste Control,* 616 F.2d 1094, 1095 (9th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980).

10. To a certain extent, our discussion of why the Government is not a necessary party under Rule 19 applies here. Northrop is not claiming that the Government has misused proprietary information or that it has directed McDonnell to do so.

11. Section 2356 was originally promulgated as § 517 of the Mutual Security Act of 1951,

Pub.L. No. 165, 65 Stat. 373, 382. That section referred to the "disclosure of information by reason of acts of the United States or its officers or employees." *Reprinted in* [1951] U.S. Code Cong. & Ad.Serv. 517, 526. The available legislative history refers only to disclosure by the Government. *See* S.Rep. No. 703, 82d Cong., 1st Sess. (1951), *reprinted in id.* 2250 at 2298. The provision was carried over as § 506 of the Mutual Security Act of 1954, Pub.L. No. 665, 68 Stat. 832, 852. That section also referred only to Government disclosure. *Cf. Kaplan v. United States,* 153 F.Supp. 787, 790, 139 Ct.Cl. 682 (1957) (dismissing a claim under the section because the product manufactured for the Government was not used "in connection with the furnishing of any assistance in furtherance of the purpose of this Act"; noting that the Government assumes liability under the section for certain disclosures by "United States Government officials").

The section was reenacted in its present form as Section 606 of the Foreign Assistance Act of 1961, Pub.L. No. 87–195, 75 Stat. 424, 440.

The Foreign Assistance Act defines "officer or employee", terms carried over from the Mutual Security Act of 1954, as "civilian personnel and members of the Armed Forces of the United States Government." *Id.,* § 644 at 515. The legislative history of the Act states that the section is a "rewrite and simplification, without substantial change" of the previous version. S.Rep. No. 612, 87th Cong., 1st Sess. (1961), *reprinted in* [1961] U.S.Code Cong. & Ad. News 2472, 2501. It therefore does not appear that the addition of the term "agent" in 1961 broadened the scope of § 2356.

■ Neither the language nor the legislative history of § 2356 suggests that the section encompasses disclosure by Government contractors. Indeed, we are unable to find a single case in which a private contractor has been found to be an agent of the Government under § 2356. Even under general agency principles, procurement contractors are ordinarily independent contractors unless the contract expressly makes them the Government's agents. *See generally United States v. Township of Muskegon,* 355 U.S. 484, 486, 78 S.Ct. 483, 485, 2 L.Ed.2d 436 (1958); *Deltec Corp. v. United States,* 326 F.2d 1004, 1005 n. 1 & 1006–07 (Ct.Cl.1964).

McDonnell argues that § 2356 embodies the same policy as 28 U.S.C. § 1498 (1976 & Supp.1980): [12] "to insulate contractors from lawsuits disruptive of the procurement process." H.R.Rep. No. 872, 82d Cong., 1st Sess. 1420 (1951). It also relies on *Hughes Aircraft Co. v. United States,* 534 F.2d 889 (Ct.Cl.1976), in arguing that § 2356 extended § 1498 to foreign sales. The language of the two sections, however, is very different.[13] Moreover, both the legislative history that McDonnell quotes and the *Hughes* court were discussing the language "by or for the United States" of § 1498. They did not address the disclosing parties encompassed within § 2356.

McDonnell argues that it is an agent of the Government because of the International Traffic in Arms Regulations ("ITARS"), 22 C.F.R. §§ 121.01 *et seq.* (subchapter M) (1981). These regulations provide that a State Department license is required for export of equipment on the United States Munitions List; the license may be denied in furtherance of world peace, national security, or foreign policy; and that State Department approval is required before opening marketing talks with a prospective foreign buyer. 22 C.F.R. §§ 123.01, 123.-05(a), and 123.16(a) (1981). The regulations require that a proposed agreement regarding a license to manufacture abroad or the furnishing of technical assistance (the disclosure of technical data) relating to Munitions List items must be approved by the State Department; the agreement may be disapproved for the same reasons as above; and the sales pitch must be approved. 22 C.F.R. §§ 124.01, 124.06(a), and 124.12(a) (1981).

■ When the Government permits disclosures abroad, it does not concern itself with the commercial ramifications of the arrangement. The regulations make this

---

The Foreign Assistance Act authorized the President to "furnish military assistance ... to any friendly country ... by—(a) acquiring from any source and providing ... any defense article or defense service...." *Id.,* § 503; *reprinted in* [1961] U.S.Code Cong. & Ad.News 470, 482–83. Specifically, it permitted the President to "furnish defense articles from the stocks of the Department of Defense" or enter into procurement contracts. *Id.,* § 507 at 484. It did not mention export licenses for commercial sales. Therefore, "the furnishing of assistance under this Act" in section 606 (now § 2356) does not expressly include commercial sales such as McDonnell's.

**12.** Suit against the Government under § 1498 is the exclusive remedy for unlawful use of a patented invention by the Government.

**13.** For instance, in contrast to the "officers, employees, or agents" language of § 2356, § 1498 provides that:

For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States *by a contractor, a subcontractor, or any person, firm, or corporation* for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.
28 U.S.C. § 1498(a) (1976) (emphasis added).

explicit with respect to proposed manufacturing license and technical assistance agreements. For instance, the regulations on proposed manufacturing license and technical assistance agreements require each agreement to state that:

> No liability shall be incurred by or attributed to the U.S. Government in connection with any possible infringements of privately owned patent or proprietary rights ... by reason of the U.S. Government's approval of this agreement.

22 C.F.R. § 124.10(h) (1981). They also require the cover letter to state that State Department approval will not be construed "as constituting either approval or disapproval of any of the business terms or conditions between the parties to the agreement." 22 C.F.R. § 124.11(d) (1981). Finally, the regulations apply the same standards to the export of technical data. 22 C.F.R. §§ 125.03 n. 2, 125.03–.05 (1981). *See generally* Sherzer, Janik and Green, *supra,* 13 Geo.Wash.J. of Int'l L. & Econ., at 581–90. Therefore, McDonnell's contention that the ITARS confer agency status on it also fails.[14] Accordingly, McDonnell is not the Government's agent in making commercial sales for purposes of § 2356 so as to justify dismissal of Northrop's complaint on the ground that its exclusive remedy is against the Government.

### B. Joinder of the Government

1. Joinder under Fed.R.Civ.P. 19 entails a practical two-step inquiry.[14a] First, a court must determine whether an absent party should be joined as a "necessary party" under subsection (a). Second, if the court concludes that the nonparty is necessary and cannot be joined for practical or jurisdictional reasons, it must then determine under subsection (b) whether in "equity and good conscience" the action should be dismissed because the nonparty is "indispensable." *See generally Provident Tradesmen's Bank & Trust Co. v. Patterson,* 390 U.S. 102, 108–25, 88 S.Ct. 733, 737–46, 19 L.Ed.2d 936 (1968); *Eldredge v. Carpenters 46,* 662 F.2d at 537.

■ The district court concluded that the Government was "both necessary and indispensable," 498 F.Supp. at 1119, because: Northrop's claims "called into question" the Government's unfettered right to "designate the who, what, when and where of weapons system production," 498 F.Supp. at 1117; injunctive relief would "necessarily limit the United States Government in its F–18 procurement activities," *id.* at 1118;

---

**14.** 32 C.F.R. § 7.104.9(7) (1981) provides that the Government may "have or permit others" to disclose information in which it has unlimited rights. "Permitting" McDonnell to disclose information by granting it an export license, however, does not make it an agent of the Government under § 2356.

**14a.** Due to the rigid, formalistic approach taken by some early courts, Rule 19 was revised in 1966 to emphasize that the appropriate focus is on the practical ramifications of joinder versus nonjoinder. *Eldredge v. Carpenters 46,* 662 F.2d 534, 537 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 231, 74 L.Ed.2d 183 (1982). The Rule now provides:

> (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. . . .

> (b) Determination by Court Whenever Joinder not Feasible.

> If a person ... cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the Court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

and relief would impinge on the Government's conduct of foreign relations by limiting the source of land-based F–18's for foreign buyers.[15] The court apparently concluded that the Government could not be joined because Congress has not authorized such suits against the Government.[16] *Id.* Our standard of review of the district court's decision is abuse of discretion. *Bakia v. County of Los Angeles,* 687 F.2d 299 (9th Cir.1982) (per curiam), and *Walsh v. Centeio,* 692 F.2d 1239 (9th Cir.1982). We hold that the court abused its discretion in holding that the government is a necessary party. Because, as discussed below, we conclude that the Government is not a necessary party to this action, we need not determine whether joinder is feasible, and, if not, whether the Government's presence would be indispensable.

Subsection (a) of Rule 19 defines two categories of parties that should be joined if feasible. If the Government fit within either category it would be a necessary party. *Eldredge,* 662 F.2d at 537; *A.J. Kellos Construction Co. v. Balboa Insurance Co.,* 495 F.Supp. 408, 414 (S.D.Ga.1980), *rev'd on other grounds,* 661 F.2d 402 (5th Cir.1981). We conclude that it does not.

■ To fit within the first category, it must appear that "complete relief" cannot be accorded between Northrop and McDonnell absent the Government's joinder. Rule 19(a)(1). *See generally* 3A J. Moore & J. Lucas, *Moore's Federal Practice,* ¶ 19.07–1[1], at 19–128 (2d ed. 1982). This factor is

concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action. *Advisory Committee's Note,* 39 F.R.D. 89, 91 (1966). McDonnell does not directly contend that the Government's absence would preclude the district court from being able to fashion meaningful relief as between the parties, and we discern no reason for so concluding.

McDonnell's necessary party argument is founded upon two contentions: (1) the Government would allegedly lose a valuable source of supply if Northrop were granted any of the relief it requests; and (2) any decree entered in Northrop's favor would allegedly expose McDonnell to conflicting obligations. McDonnell's two contentions track the alternative subparts (i) and (ii) of Rule 19(a)(2), concerning prejudice to the absent party or to those already parties. Subparts (i) and (ii) are contingent, however, upon an initial requirement that the absent party claim a legally protected interest relating to the subject matter of the action. *Cf. Central Council of Tlingit & Haida Indians v. Chugach Native Association,* 502 F.2d 1323, 1326 (9th Cir.1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975) (Secretary of the Interior not a necessary party to a boundary dispute between Native American groups because he claimed no protectable interest).

The Government is not a party to any of the teaming agreements, and has never asserted a formal interest in either the sub-

---

**15.** Review of the district court's decision is complicated by its failure to articulate clearly the considerations underlying its conclusions as to each step in the Rule 19 inquiry. For example, after reciting the factors in subsection (b)'s test for an indispensable party, the court observed that Northrop "disclaims the necessity of joinder," a consideration pertinent to subsection (a). *Id.* at 1117–18.

The confusion that frequently accompanies joinder rulings is attributable in part to the degree to which the factors cited in Rule 19's two subsections overlap each other. Impairment of the absent party's ability to protect its interest (19(a)(2)(i)) is similar to the prejudice to the absent party consideration under subsection (b); risk of leaving a defendant exposed to inconsistent obligations (19(a)(2)(ii)) is similar

to the prejudice to the defendant factor under (b); and whether complete relief can be accorded (19(a)(1)) is similar to the adequacy of relief inquiry under (b).

**16.** Although the district court's opinion does not discuss the feasibility of joining the Government, one of its conclusions of law provides that "no act of Congress would permit Northrop to bring *this particular action* against the United States" (emphasis added). Because the Government is not a necessary party, we need not address Northrop's contention that the court should have joined the Government in a claim under 22 U.S.C. § 2356(a)(2) (waiving sovereign immunity for disclosure of protected information) (*see* Section IIA, *infra*) rather than find it indispensable.

ject matter of this action or the action itself. On the contrary, the record reflects that the Government has meticulously observed a neutral and disinterested posture, and regards this as a private dispute. The Navy has declared its intent to respect the teaming relationship, and has consistently advised the parties to resolve their disagreements in accordance with law and their private agreements. McDonnell offers no cogent reason why we should second-guess the Government's assessment of its own interests.

 A nonparty to a commercial contract ordinarily is not a necessary party to an adjudication of rights under the contract. *See, e.g., Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc.,* 564 F.2d 816, 820 (8th Cir. 1977); *Trans Pacific Corp. v. South Seas Enterprises, Ltd.,* 291 F.2d 435, 436–37 (9th Cir.1961); 7 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1613, at 135 (1972). This rule is not inapplicable merely because the absent party happens to be the Government. *See, e.g., Coastal Modular Corp. v. Laminators, Inc.,* 635 F.2d 1102, 1108 (4th Cir.1980); *Fidelity & Casualty Co. v. Reserve Insurance Co.,* 596 F.2d 914, 918 (9th Cir.1979); *R.C. Hedreen Co. v. Crow Tribal Housing Authority,* 521 F.Supp. 599, 608 (D.Mont.1981). The correlative rule that all parties who may be affected by a suit to set aside a contract must be present, *see Lomayaktewa v. Hathaway,* 520 F.2d 1324, 1325 (9th Cir.1975), *cert. denied,* 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976), is inapplicable here because Northrop is not seeking to set aside or enjoin performance under any contract between McDonnell and the Government.

McDonnell correctly points out that this case differs from the usual commercial dispute in that the absent party, the Govern-

ment, is involved with the agreements at issue, even though it is not a party to them. The Government prompted the parties to enter the teaming agreements and, due to its extensive involvement in the military procurement arena, exerts a tremendous influence on them. Although we have previously adjudicated disputes between federal defense contractors where the Government was not a party, *see Experimental Engineering, Inc. v. United Technologies Corp.,* 614 F.2d 1244 (9th Cir.1980); *American Pipe & Steel Corp. v. Firestone Tire & Rubber Co.,* 292 F.2d 640 (9th Cir.1961), we have found no decision directly addressing the necessity of joining the Government when such disputes are litigated.[17] We are therefore reluctant to rely too heavily on the rules applicable to ordinary commercial contracts and will take a closer look at the nature of the Government's interest in this dispute.

 McDonnell's contention that the Government's interests will be prejudiced— the controlling inquiry under Rule 19(a)(2)(i)—springs from the erroneous premise that Northrop is challenging the Government's rights in the data and technology surrounding the F–18 development effort and right to control weapons system production. First, neither Northrop's allegations regarding McDonnell's use of YF–17 derivative technology nor its requested relief would in any way challenge the Government's "unlimited rights"[18] to use and dispense that data. The Government's rights in that data, although unlimited, were neither sole nor exclusive and did not divest Northrop of the residual right to continue to use the technology itself and to share it with other private parties. *See Regents of University of Colorado v. K.D.I. Precision Products, Inc.,* 488 F.2d 261, 264 (10th Cir.1973) (interpreting language iden-

---

**17.** The most useful decision appears to be *Coastal Modular Corp. v. Laminators, Inc.,* 635 F.2d at 1108, where the Fourth Circuit held that the Navy was not a necessary party to a contract action between airport contractors merely because the defendant "theorize[d] the possibility that the Navy would institute suit against it."

**18.** "Unlimited Rights" are defined in 32 C.F.R. § 7–104.9(a)(7) (1981) as the "rights to use, duplicate or disclose technical data or computer software in whole or in part in any manner and for any purpose whatsoever, and to have or permit others to do so."

tical to that in 32 C.F.R. § 7–104.9(a) [*see* note 14, *supra*] ).

 Second, Northrop seeks no relief from the Government and no relief against McDonnell that would preclude McDonnell from complying with any Governmental directive or from producing a particular aircraft. As Northrop represented below:

> If the Government . . . goes to McDonnell and says "we have unlimited rights in this data and taking those unlimited rights and giving them to you we want you to do this," the Government [is] free to do that. They can go to Grumman, they can go to LTV, they can go to Lockheed. They have unlimited rights. That is not anything we are contesting here.

It is undisputed that McDonnell may use the YF–17 derivative data in responding to a Government procurement request. Unlike other contractors, however, McDonnell would be liable to Northrop if, in electing to respond, it violated its antecedent promises to Northrop.

 Focusing on Rule 19(a)(2)(ii), McDonnell argues that Northrop's construction of the agreements would deter McDonnell from responding to such a Government request by saddling it with inconsistent obligations, and, in so doing, would interfere with the Government's procurement prerog-

atives. To reach this conclusion, however, it would be necessary to make several assumptions that are unwarranted on this limited record and at this preliminary stage of the proceedings. We would have to hypothesize both that the Government will ask McDonnell to develop land-based F–18's and that, when presented with the opportunity to participate as prime contractor in such a procurement request, McDonnell would forego that opportunity because of its prior contractual agreements with Northrop. To conclude that such a hypothetical election by McDonnell would impair the Government's unlimited right to use F–18 technology, we would have to assume further that the Government has an enforceable expectation that a defense contractor like McDonnell will fill a procurement request.[19] The Record is replete with evidence to the contrary. There are any number of commercial considerations, including existing contractual obligations, that routinely prompt defense contractors to decline to participate in a particular Government procurement offering. As Northrop cogently argues in its brief, a contractor's commercially based decision to forego a military contract does not impair the Government's unlimited rights in the desired product's technology or right to control military procurement activity.[20]

**19.** *McDonnell cannot avoid this fallacy in its argument by suggesting that the Government might ask it to modify the carrier-suitable features of the F–18A under the "changes clause" of its prime contract with the Navy. First, no such change order has been issued. Second, the mere existence of the changes clause found in most Government military contracts does not permit a contractor to breach its preexisting contractual obligations to other private parties. See Westinghouse Electric Corp. v. Garrett Corp., 437 F.Supp. 1301, 1338 n. 53 (D.Md. 1977), aff'd, 601 F.2d 155 (4th Cir.1979).*

**20.** *Northrop points out that:*

> *The impact on the government that would result from an award of declaratory or monetary relief to Northrop in this case is no different from that which would occur if [McDonnell], when presented with the opportunity for a federal contract, determined that it had insufficient capacity to perform any resulting contract unless it diverted facilities*

> *and personnel currently dedicated to the production of DC–9's and DC–10's for its commercial airline customers. In such an event, [McDonnell] would be required to balance the value of the added federal business against the liabilities it would incur by abandoning its prior contractual commitments to the airlines. And if [McDonnell] elected to pursue the later-presented federal opportunity, the airlines would be entitled to seek declaratory and/or monetary relief under their contract with [McDonnell]. Clearly, the United States would not be indispensable to such litigation. To so hold would—contrary to all precedent—pervert Rule 19 by transforming it into a haven for sellers like [McDonnell] who, when they find it expedient or profitable, elect to disavow prior commitments by subsequently entering into contracts that are inconsistent with their previous contractual promises.*

We conclude that the Government's hypothetical interest in having McDonnell serve as prime contractor for land-based F–18's does not mandate joinder under Rule 19(a).[21] Speculation about the occurrence of a future event ordinarily does not render all parties potentially affected by that future event necessary or indispensable parties under Rule 19. *See Coastal Modular Corp.,* 635 F.2d at 1108; *Arthur v. Starrett City Associates,* 89 F.R.D. 542, 547 (E.D.N.Y.1981); *Sierra Club v. Leslie Salt Co.,* 354 F.Supp. 1099, 1105 (N.D.Cal.1972). The Government is not a necessary party to what is essentially a contract and antitrust action between private parties solely because the dispute arises in the regulated military aircraft industry. *Cf. Grumman Corp. v. LTV Corp.,* 665 F.2d 10 (2d Cir. 1981) (resolving an antitrust and securities law dispute between private manufacturers of military aircraft with no suggestion that the Government's joinder was necessary). Absent a more particularized and compelling governmental interest, private disputes arising within this important commercial sector should be governed by traditional Rule 19 principles. Finally, if Northrop eventually succeeds on any or all of its claims, a matter on which we express no opinion, we believe that adequate relief could be shaped that would neither impair a significant Government interest nor subject McDonnell to any greater inconsistent obligation than it freely assumed.

## C. Failure to State a Claim

The district court held that the complaint failed to state a claim because the political question and act of state doctrines precluded judicial inquiry into the subject matter of this dispute. The act of state doctrine is essentially the foreign counterpart to the political question doctrine. Both doctrines require courts to defer to the executive or legislative branches of government when those branches are better equipped to handle a politically sensitive issue. *International Association of Machinists v. OPEC,* 649 F.2d 1354, 1358 (9th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982). Neither doctrine is susceptible to inflexible definition, and both must be applied on a case-by-case basis by balancing a variety of factors. *Id.* at 1358–59. With that in mind, we turn to the case at hand.[22]

1. Political Question: The district court construed the complaint as asking the court to decide "*WHO* will be the exclusive builder (prime contractor) for the carrier-suitable or land-based versions of the F–18 weapons system" and to be, in effect, "the super-procurer and sales licensor of a military weapons system." 498 F.Supp. at 1120. It held that the case therefore presented a nonjusticiable political question under *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). *Id.*

*Baker* contains several considerations that help identify a political question: (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards; (3) the impossibility of deciding without an initial policy determination reserved for nonjudicial discretion; (4) the impossibility of deciding without expressing lack of respect for the coordinate branches of government; (5) unusual need for adherence to a political decision already made; and (6) the potentiality for embarrassment from multifarious pronouncements by various departments. 369 U.S. at 217, 82 S.Ct. at 710. *See also Goldwater v. Carter,* 444 U.S. 996, 998, 100 S.Ct. 533, 534, 62 L.Ed.2d 428 (1979) (Powell, J., concurring) (summarizing indicia of a political question). The district court did not identify which of the *Baker* factors suggests that Northrop's entire ac-

---

**21.** Any interest the Government may have in McDonnell's production efficiencies and sunk costs, if cognizable, is at most a disputed question of fact that was not addressed below and therefore does not justify dismissal at this juncture.

**22.** In reviewing a dismissal for failure to state a claim, we construe the material allegations in the complaint as being true. *Benson v. Arizona State Board of Dental Examiners,* 673 F.2d 272, 275 n. 7 (9th Cir.1982).

tion presents a political question. McDonnell invokes the last three *Baker* factors because the Government approved McDonnell's sale of F–18's to Canada, has authorized it to export F–18 technology to several other countries, and has allegedly asked it to make a presentation about the F–18 to the Air Force and a Defense Department committee.[23]

We discern no support for characterizing Northrop's claims as political questions regardless of which factors are considered. Northrop does not challenge the wisdom or legality of any governmental act or decision. Instead, it seeks to restrain and recover damages from McDonnell for the latter's allegedly improper tactics in marketing F–18's. The challenged activity by McDonnell was neither authorized nor directed by any branch of Government. The mere fact that the challenged conduct occurred in a regulated industry does not alone alter its private commercial character. The issues presented for trial are not political questions—they are legal issues, involving private commercial activity which the judiciary is uniquely equipped to resolve. Northrop's claims do not seek the kind of direct interjection of the judiciary into the Government's procurement activity that would transform this private suit into a political question. *See Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) (court supervision of National Guard training constituted a political question); *Sarnoff v. Connally,* 457 F.2d 809, 809–10 (9th Cir.), *cert. denied,* 409 U.S. 929, 93 S.Ct. 227, 34 L.Ed.2d 186 (1972) (action challenging war-power provisions of the Foreign Assistance Act presented a political question); *Rappenecker v. United States,* 509 F.Supp. 1024, 1028–30 (N.D.Cal.1980) (claim that President was negligent in responding to seizure of American cargo vessel by Cambodian gunboats dismissed as political question).[24]

2. *Act of State:* Pursuant to the act of state doctrine, this nation's courts will not "sit in judgment on the acts of" another country. *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897). Even in private suits, American courts will not resolve issues requiring "inquiries . . . into the authenticity and motivation of the acts of foreign sovereigns." *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92, 110 (C.D.Cal.1971), *aff'd,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972). The doctrine has no explicit fountainhead in our Constitution or statutes, and derives principally from the judiciary's desire not to interfere with the conduct of foreign policy by the political branches of government. *International Association of Machinists v. OPEC,* 649 F.2d at 1359; *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597, 605 (9th Cir. 1976). In determining whether the doctrine compels dismissal, courts must carefully "balance [the] relevant considerations." *Timberlane,* 549 F.2d at 606, 607 (quoting *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964)). The justification for forbearance depends greatly on the importance of the issue's implications for our foreign policy. *Id.*

McDonnell argued below that Northrop's claims would require the district court to review the procurement actions of foreign sovereigns in order to decide whether McDonnell's alleged conduct was causally connected to Northrop's lost foreign F–18 sales. The court stated that "if" McDonnell was correct in its assertion, the doctrine mandated dismissal. 498 F.Supp. at 1121.

---

**23.** Although the record offers little evidence of a Government request for such a presentation, and Northrop vigorously disputes it, we assume it to be true for purposes of this issue.

**24.** McDonnell's reliance on *Haig v. Agee,* 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) and *Rostker v. Goldberg,* 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) is misplaced. In contrast to Northrop, the plaintiffs in *Agee* and *Rostker* directly challenged the propriety of decisions made by the President and Congress. *Agee* challenged the validity of the President's revocation of his passport. *Rostker* involved an equal protection challenge to the validity of the males only provision of the Military Selective Service Act.

The court failed, however, to determine whether McDonnell was in fact correct and never identified a foreign act of state that would require review to adjudicate Northrop's claims.

Northrop concedes that military procurement decisions by foreign sovereigns are acts of state. The issue here, however, is whether resolution of Northrop's claims would necessitate direct judicial inquiry into such decisions. We conclude that it would not.

 Northrop's damage allegations pertain to McDonnell's private commercial conduct and are not inextricably bound up in any foreign act of state.[25] The claims relating to the increased costs associated with duplicating technology that McDonnell was allegedly contractually obligated to furnish Northrop will not require the court to inquire into any foreign procurement decisions because Northrop can establish the fact of damage without reference to lost sales by proof of increased costs. Northrop has alleged injury of a type and amount sufficient to avoid dismissal. *See Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 659–60, 81 S.Ct. 365, 367–68, 5 L.Ed.2d 358 (1961) (per curiam). Whether Northrop can eventually establish the amount of damages without implicating foreign procurement decisions, and whether that implication is permissible, are disputed questions which we need not address at this stage of the proceedings. *See Williams v. Curtiss-Wright Corp.,* 694 F.2d 300, 304 (3d Cir.1982); *Industrial Investment Development Corp. v. Mitsui & Co.,* 594 F.2d 48, 55 (5th Cir.), *reh. denied,* 599 F.2d 449 (1979), *cert. denied,* 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980). The same conclusion applies to Northrop's contract and tort claims for monetary relief.

We decline to construe the act of state doctrine ·to shield all violators of private agreements that involve some foreign governmental act. As noted by the Fifth Circuit in reaching this same conclusion:

> Precluding all inquiry into the motivation behind or circumstances surrounding the sovereign act would uselessly thwart legitimate American goals where adjudication would result in no embarrassment to executive department action. [Plaintiff] must only question that government's motivation to the extent of measuring its damage. No ethical standard is set by which the propriety of its decision is tested. Surely the limited nature and effect of determining the proportional cause of plaintiffs' damage allocable to defendants' conduct does not trigger the type of special political considerations protected by the act of state doctrine.

*Id.*

 McDonnell's contention that Northrop's claims for injunctive relief are barred is also unpersuasive. Even if Northrop's harm from future misconduct would be measured solely by lost sales, there is no reason to extend the act of state doctrine to *future* decisions by foreign governments. The court need only find a likelihood that McDonnell's actions will cost Northrop *some* amount of future sales. That finding would not create the foreign policy tensions that the act of state doctrine was designed to avoid.

A comparison of this case with *OPEC* and *Timberlane,* this court's most comprehensive forays into act of state analysis, confirms that the doctrine is inapplicable here. The doctrine compelled dismissal in *OPEC* because the plaintiff directly sued a cartel of sovereign nations, charging them with violating this country's antitrust laws, and sought to enjoin and recover damages from the nations. 649 F.2d at 1361. In *Timberlane,* we refused to invoke the doctrine even though the activity complained of (conspiracy to monopolize Honduran lumber export business) primarily involved foreign citi-

---

**25.** Although "seemingly commercial activity" can trigger act of state concerns, *see OPEC,* 649 F.2d at 1360 (alleged oil price-fixing by cartel of foreign nations), purely commercial activity ordinarily does not require judicial forbearance under the act of state doctrine. *Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 698, 96 S.Ct. 1854, 1863, 48 L.Ed.2d 301 (1976).

zens, took place in a foreign nation, and had the greatest impact on the foreign nation. We reasoned that the plaintiff did not seek to name any foreign nation or officer as a defendant and did not directly challenge the foreign nation's conduct in a way that would threaten relations with the country. 549 F.2d at 608. We emphasized that "there is no indication that the actions of the Honduran [government] reflected a sovereign decision that [plaintiff's commercial] efforts should be crippled or that trade with the United States should be restrained." *Id.*

*Timberlane* is clearly the more analogous decision. In contrast to the *OPEC* plaintiff, Northrop does not seek monetary or injunctive relief against any sovereign and does not ask the court to pass judgment on any foreign sovereign's act or policy. As noted in *Timberlane,* the act of state doctrine "does not bestow a blank-check immunity upon all conduct blessed with some imprimatur of a foreign government".[26] 549 F.2d at 606.

### III

### Workshare Claims

■ Northrop requested that McDonnell be enjoined from subcontracting to anyone else the share of work Northrop was entitled to under the teaming agreements and Navy subcontract. Neither the district court's opinion nor its Findings of Fact and Conclusions of Law address Northrop's workshare claims. The court's order stated that those claims "are moot and not ripe for determination in light of [McDonnell's] stipulation of November 28, 1979." That stipulation apparently involved the parties' respective share of the work generated by Canadian sales.

Northrop argues that the court erred in finding that the stipulation mooted its Canadian workshare claims and that, in any event, the workshare claims are not limited

to Canada. McDonnell does not argue the mootness issue. It contends that the workshare claims were properly dismissed for absence of an indispensable party, lack of subject matter jurisdiction, and nonjusticiability, "regardless of whether [they] were moot."

Our disposition of the dismissal rulings relied on by McDonnell makes it necessary to address the mootness issue. On remand, the district court should make specific findings and conclusions regarding the scope of the stipulation and the extent to which Northrop's workshare claims are mooted by it. If, as Northrop contends, the stipulation was purely *pendente lite* or was limited to Canadian sales, wholesale dismissal for mootness was clearly inappropriate.

### IV

### Summary Judgment

The district court granted McDonnell summary judgment on the grounds that: (1) the contract-responsibility clause of the Basic Agreement, as amplified in the August 26, 1976 Agreement, was *per se* unreasonable under section 1 of the Sherman Act; and (2) Northrop had failed to establish a prima facie case of attempt to monopolize under section 2 of the Sherman Act. We conclude that summary judgment was inappropriate on either ground.

Before turning to the specifics of the two issues, we note by way of overview that the summary judgment rulings reflect two basic inconsistencies. The first inconsistency pertains to the jurisdictional requirement of interstate commerce. The court held that no "trade or commerce" existed for section 2 purposes because the Government exercised absolute control over the relevant markets, yet, concomitantly, ruled that sufficient interstate commerce would be restrained by Northrop's interpretation of the contract-responsibility clause to justify

---

**26.** In a similar vein, the court noted that "mere governmental approval or foreign governmental involvement which the defendants had arranged does not provide a defense". *Id.* Accord, *Continental Ore Co. v. Union Carbide &* *Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *United States v. Sisal Sales Corp.,* 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927).

holding the practice *per se* unreasonable under section 1. The second inconsistency stems from the court holding that there was nothing so unique about this practice or industry to warrant rule-of-reason analysis under section 1, but that this case is so unlike those cases where section 2 sanctions have traditionally been applied that the section was inapplicable here.

### A. Applicable Standard

■ Summary judgment is appropriate under Fed.R.Civ.P. 56(c) only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Bank of California, N.A. v. W.H. Opie*, 663 F.2d 977, 979 (9th Cir.1981); *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 438–39 (9th Cir.1979). This court has noted that "the showing of a genuine issue for trial is predicated upon the existence of a legal theory which remains viable under the asserted version of the facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law." *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1381 (9th Cir.1981), *cert. denied*, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1982). In reviewing the record to make this determination, the court must draw all inferences in the light most favorable to Northrop, the party opposing the motion. *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620, 624 (9th Cir.1977). Although summary judgment is sometimes appropriate in antitrust litigation, *see, e.g., Thomsen v. Western Electric Co.*, 680 F.2d 1263, 1265 (9th Cir.1982); *Ron Tonkin Gran Turismo*, 637 F.2d at 1381; *Thi-Hawaii, Inc. v. First Commerce Financial Corp.*, 627 F.2d 991 (9th Cir.1980), it is generally disfavored, especially when motive or intent is at issue. *See, e.g., Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Betaseed, Inc. v. U. & I. Inc.*, 681 F.2d 1203, 1207 (9th Cir.1982); *A.H. Cox & Co. v. Star Machinery Co.*, 653 F.2d 1302, 1305 (9th Cir.1981); *California Steel & Tube v. Kaiser Steel Corp.*, 650 F.2d 1001, 1003 (9th Cir.1981).

### B. Restraint of Trade

Northrop challenges the district court's ruling that the "contract-responsibility" clause (quoted *supra* at 5–6) at issue in counts 1–3, 6, and 7 of Northrop's complaint is *per se* unreasonable as a market-allocation restraint of trade under section 1 of the Sherman Act. We conclude that the court erred in applying *per se,* rather than rule-of-reason, analysis in this novel context.

■ Generally speaking, the Sherman Act bans all arrangements that are adopted to reduce competition, or which, regardless of purpose, have a significant tendency to reduce competition. Thus, arrangements that are adopted for and tend to achieve other purposes are not condemned by the Act merely because they carry some incidental and inconsequential restraining effect on competition. L. Sullivan, *Antitrust,* § 63 at 166 (1977).

Although this determination is ordinarily made through rule-of-reason analysis—a process calling for thorough investigation of the industry at issue and a balancing of the arrangement's positive and negative effects on competition—certain agreements or practices are so "plainly anticompetitive," *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 50, 97 S.Ct. 2549, 2558, 53 L.Ed.2d 568 (1977), and so "lack [ ] any redeeming virtue," *Northern Pacific Railway v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), that they are conclusively presumed illegal without the need for detailed rule-of-reason analysis. Horizontal market division, the practice claimed to exist here, is one of four main categories of competitive restraints this court has held unreasonable *per se. See A.H. Cox & Co. v. Star Machinery,* 653 F.2d at 1305; *Gough v. Rossmoor Corp.,* 585 F.2d 381, 386 (9th Cir. 1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). Nevertheless, even within this class of restraints, there

are recognized circumstances where rule-of-reason analysis remains appropriate. *See, e.g., Broadcast Music, Inc. v. Columbia Broadcasting System,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1978) (blanket licensing arrangement between horizontal competitors not *per se* illegal); *Turf Paradise, Inc. v. Arizona Downs,* 670 F.2d 813, 821–24 (9th Cir.) (as amended) (temporal market allocation provision of lease drafted by horizontal competitors not *per se* illegal), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982).

Northrop argues that three such circumstances make rule-of-reason analysis appropriate here: (1) neither the exact type of teaming arrangement at issue in this case nor the military aircraft industry in general have been subject to prior antitrust scrutiny; (2) the arrangement actually enhanced competition by introducing a new competitor, McDonnell, into a market from which it was otherwise foreclosed; and (3) the contract-responsibility clause is an essential aspect of, and reasonable limitation upon, the agreement to exchange technology. We agree that the case involves novel antitrust considerations, and reject McDonnell's contention that this is simply a run-of-the-mill case of market allocation between horizontal competitors.[27] We shall discuss each of these factors supporting the rule of reason.

1. Judicial experience with the challenged conduct: This factor strongly supports application of rule-of-reason analysis. As recognized in *United States v. Topco Associates,* 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972), and recently reaffirmed in *Broadcast Music,* 441 U.S. at 9, 99 S.Ct. at 1557, "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations...." Neither the district court nor McDonnell point to a single instance in which the military aircraft industry in general or Government prompted contractor teaming agreements in particu-

lar have received judicial scrutiny in a Sherman Act context.

McDonnell reads *Broadcast Music* too narrowly. McDonnell argues that because the contract-responsibility clause can be viewed as a simple market-splitting device and because market-splitting devices have been held *per se* unreasonable in other contexts, *per se* treatment was appropriate here. According to McDonnell, a court need go no further than determining the general type of "practice" at issue in deciding whether to apply rule-of-reason analysis. This is precisely the type of "literalness" expressly condemned in *Broadcast Music:*

> The Court of Appeals' literal approach does not alone establish that this particular practice is one of those types or that it is "plainly anticompetitive" and very likely without "redeeming virtue." Literalness is overly simplistic and often overbroad.
>
> . . . .
>
> "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations...." See *White Motor Co. v. United States,* 372 U.S. 253, 263 [83 S.Ct. 696, 702, 9 L.Ed.2d 738] (1963). We have never examined a practice like this one before; indeed, the Court of Appeals recognized that "[i]n dealing with performing rights in the music industry we confront conditions both in copyright law and in antitrust law which are *sui generis.*" 562 F.2d, at 132. And though there has been rather intensive antitrust scrutiny of AS-CAP and its blanket licenses, that experience hardly counsels that we should outlaw the blanket license as a *per se* restraint of trade.

441 U.S. at 9–10, 99 S.Ct. at 1557.

In *Maricopa County,* the Court rejected the contention that it should not apply the usual *per se* rule against horizontal price

---

**27.** In doing so, we note that the contract-responsibility clause at issue here differs significantly from the horizontal price-fixing arrangements the Supreme Court has uniformly subjected to *per se* condemnation. *See, e.g., Ari-*

*zona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) (per curiam).

fixing because the judiciary had little antitrust experience with the health-care industry. The Court rejected the argument because " 'so far as price-fixing agreements are concerned, [the Sherman Act] establishes one uniform rule applicable to all industries alike.' " 457 U.S. at 349, 102 S.Ct. at 2476, *quoting United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 222, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940). The Court was careful to point out, however, that its decision "should not be confused with the established position that a *new per se* rule is not justified until the judiciary obtains considerable rule of reason experience with the particular type of restraint challenged." 457 U.S. at 349, 102 S.Ct. at 2476 n. 19 (emphasis in the original). We find no significant judicial rule-of-reason experience with either the particular practice or industry at issue here and therefore conclude that imposing a new *per se* rule would be premature.

2. Effect on competition: This is the most troubling and conceptually elusive of the three factors. Echoing the district court, McDonnell argues that the agreements destroy competition because they split the market into product categories—limiting Northrop to selling land-based F–18L's and McDonnell to selling carrier-suitable F–18A's. Although tenable, the argument is overly simplistic and is not an entirely accurate reading of either the agreements or the relief sought by Northrop.

■ The critical inquiry in determining whether *per se* condemnation should be extended to a previously unexamined business practice is whether the "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, ... or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.' " *Broadcast Music,* 441 U.S. at 19–20, 99 S.Ct. at 1562 (citations omitted). *Accord, Krehl v. Baskin-Robbins Ice*

*Cream Co.,* 664 F.2d 1348, 1356 (9th Cir. 1982). In making this inquiry, we are mindful of the Court's admonition that "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than ... upon formalistic line drawing." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977).

■ The agreements call for a joint effort by both "teammates" in the production and sale of *all* F–18's. The agreements allocate which party may act as prime contractor and which as principal subcontractor (depending on the type of F–18); they do not foreclose, at least in the traditional market-splitting sense, these competitors from competing in regard to their respective versions of the jointly developed F–18 fighter concept. There is evidence, which must be accepted as true at this posture of the proceedings, that the agreements have not eliminated head-to-head competition in international markets between the two variants of the joint F–18 development effort—a surprisingly procompetitive occurrence in an industry typified by single-source products.[28] For example, Canada, the first international purchaser of an F–18, chose McDonnell's carrier-suitable F–18A over Northrop's land-based F–18 even though it intended to base the aircraft on land. The market appeal of carrier-suitable aircraft for land-based operation was demonstrated during the 1970's by McDonnell's successful marketing of its carrier-suitable F–4 "Phantom" for land-based use.

More important, however, is the fact that but for the teaming effort General Dynamics and other manufacturers of aircraft fitting the same general buyer needs as the F–18 would have had neither F–18 variant to compete against. Thus, not only do the agreements not preclude all competition between the parties' respective variants of the F–18, they actually foster competition by

---

**28.** The record indicates that almost every military aircraft marketed by an American manufacturer since World War II has, for all practical purposes, been available from only a single source. One obvious reason for this phenomenon is the magnitude of the economic and technological bases necessary to enter the military aircraft markets where a single product such as the F–18 reflects nearly a decade of development and sells for over $15 million each.

allowing both parties to compete in a market from which they were otherwise foreclosed.[29]

Thus, McDonnell's impact-on-competition argument is misleading in the special context of this industry and practice. For although the agreements suppress competition between the parties in the sense that they designate which party will be the prime contractor for different versions of the F-18, there would be no competition but for the agreements. As noted by one deponent:

> The agreements between Northrop and [McDonnell] do not have the effect of limiting competition to an extent greater than the naturally existing limitations brought about by ... the Congressional mandate limiting the Navy to choosing between a General Dynamics YF-16 and a Northrop YF-17. Without the opportunity of teaming with Northrop, [McDonnell] would not have been able to participate in the Navy competition and would not be in a position to participate in sales of current generation YF-17 type fighters either in the United States or abroad.

Given this evidence, it would be a reversion to the kind of "formalistic line drawing" eschewed in *GTE Sylvania,* 433 U.S. at 58–59, 97 S.Ct. at 2561–2562, to hold this novel teaming arrangement a *per se* violation of the Sherman Act solely because it arguably has some characteristics of a horizontal restraint.

■ Where the effect on competition is equivocal, it is appropriate to examine the purpose of the restraint in deciding whether to apply the *per se* rule. *Broadcast Music,* 441 U.S. at 19–20, 99 S.Ct. at 1562–1563. The teaming effort at issue here was done at its customer's request (the Government). The undisputed purpose of the teaming effort was to develop a partic-

ular weapons system desired by the Government. There is evidence that the contract-allocation clause was included to avoid repeating a previous military-aircraft contracting "fiasco"[30] that occurred due to lack of teaming, not to suppress competition. Thus, viewing the evidence in the light most favorable to Northrop, the agreements are not the sort of "naked restraint of trade with no purpose except stifling competition," *White Motor Co.,* 372 U.S. at 263, 83 S.Ct. at 702, for which *per se* condemnation is appropriate.

■ We note by way of conclusion on this point, without deciding on the basis of the incomplete record before us, that there is a question as to whether it even matters if the agreements foreclosed some competition between Northrop and McDonnell. In distinguishing the price-fixing practice fashioned by the health-care foundation in *Maricopa County* from the blanket licenses in *Broadcast Music,* the Court stated that:

> The foundations are not analogous to partnerships or other joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit. In such joint ventures, the partnership is regarded as a single firm competing with other sellers in the market.

*Maricopa County,* 457 U.S. at 356, 102 S.Ct. at 2479–80. As the Court notes, affiliated businesses cannot be held to conspire with each other where they function as essentially a single economic unit. *Accord, Murray v. Toyota Motor Distributors, Inc.,* 664 F.2d 1377, 1379 (9th Cir.) (*per curiam*), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2905, 73 L.Ed.2d 1314 (1982). *See also Thomsen v. Western Electric Co.,* 680 F.2d 1263, 1266 (9th Cir.1982). No adverse effect on competition need be shown here if it develops on

---

**29.** Moreover, the agreements do not impinge upon the parties' unfettered right to develop and market aircraft suitable for any type of basing so long as the new aircraft are not "of basically the same configuration" as the team produced F-18 (*see* ¶ 3 of the Basic Agreement).

**30.** This occurred when a single contractor was unable to resolve the conflicting design demands of producing variants of a single aircraft for both the Air Force and Navy.

remand that, despite the disavowal of a joint venture contained in the agreement, Northrop and McDonnell should be viewed as "teammates" constituting a single economic unit for purposes of the F–18 market.

 3. Limitation upon license of technology: As an additional basis for holding *per se* treatment inappropriate, Northrop argues that the agreements are reciprocal licenses of technology and that the contract-responsibility clause is a reasonable use limitation. Reciprocal license agreements are not *per se* violations if the technology was otherwise unobtainable by the licensee (McDonnell) and the use limitation is "reasonable." *A & E Plastik Pak Co. v. Monsanto Co.,* 396 F.2d 710, 715 (9th Cir. 1968).

 McDonnell argues that the YF–17 technology transferred by Northrop was otherwise available to McDonnell, albeit in less useful form, because the Government had purchased unlimited rights in such technology. McDonnell argues further that the use limitations sought by Northrop are unreasonable because: (1) they are broader and of longer duration (arguably for as long as F–18's can be marketed) than is necessary to protect Northrop's legitimate interests; (2) the F–18 product they are sought to be imposed on is far different from the "paper" technology and YF–17 prototype technology provided by Northrop; (3) the Government provided the business opportunity (*i.e.,* the chance to compete for the Navy contract), not Northrop; and (4) territorial restraints are unreasonable where the parties receive their *quid pro quo* in the mutual exchange of valuable information.

The fatal weakness in McDonnell's argument is that, although advanced in support of summary judgment, it hinges on bitterly contested facts. Also, McDonnell's position regarding the availability of the technology appears somewhat disingenuous—for if the technology was readily obtainable and usable, why do the memoranda by McDonnell's top executives indicate the necessity of teaming to obtain the technology? Although Northrop's licensing theory alone is probably an insufficient reason to require rule-of-reason analysis, it does add weight to the other factors, especially the argument that the antitrust implications of such teaming/technology/licensing arrangements in the military aircraft industry are *sui generis.*

## C. Attempt to Monopolize

Northrop contends that McDonnell breached the agreements in such a manner as to attempt to monopolize the F–18 market.[31] McDonnell argues that even if its conduct contravened the terms of the agreements, there was sufficient governmental involvement by regulation and licensing of foreign sales efforts to support dismissal.

The parties characterize the district court's ruling very differently. Northrop contends that the court held that McDonnell's conduct in the F–18 markets was "immune" from section 2 of the Sherman Act because the military aircraft industry is subject to such pervasive federal regulation. McDonnell argues that the ruling is based, not on an immunity theory, but, rather, on the conclusion that two of the requisite elements of attempted monopolization are absent—namely, "dangerous probability of success" and "monopolistic intent."

Careful study of the district court's opinion and findings fails to disclose the exact basis for the ruling. The truth appears to lie somewhere between the extremes advocated by the parties.

The most tenable reading of the district court's opinion is that, although the court based its decision on the pervasive role of the government in the military-aircraft industry (rather than on the absence of the elements of attempt to monopolize), it did not squarely base its decision on immunity

---

**31.** *See* footnote 6 *supra,* and accompanying text for a more specific description of Northrop's claims.

grounds.[32] The court appears to have reasoned that the Government so controls the normal competitive process—from the inception of the F–18 design to its eventual marketing—that no "trade or commerce" as defined by the Sherman Act exists.[33] The district court's ruling is erroneous regardless of whether it is evaluated as being based on "trade or commerce," "immunity," or "failure to prove a prima facie case" grounds.

■ 1. Interstate commerce: Viewing the record in the light most favorable to Northrop, we cannot conclude as a matter of law that Northrop's section 2 claim fails for lack of a sufficient nexus with interstate commerce. Neither party disputes the district court's findings that the relevant product market is the "F–18 weapons system" and that the relevant geographic market is "arguably the world." 498 F.Supp. at 1123. The fact that the Government exercises significant control over the entry of private parties into these markets does not mean that there is no trade or commerce involved in competing in such markets. As noted by Northrop, there is undisputed evidence that the F–18 is being assembled in at least two different states, using materials and components shipped by vendors from all over the country and world. The Supreme Court has repeatedly observed that, consonant with the broad purposes of the antitrust laws, almost any activity that has "interstate incidents" satisfies the Sherman Act's jurisdictional requirement. *See, e.g., McClain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980); *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). *Accord, Community Builders, Inc. v. City of Phoenix,* 652 F.2d 823, 827 (9th Cir.1981) (need only affect a "not insubstantial" amount of interstate commerce).

■ The fact that the Government is the sole domestic purchaser and regulates foreign F–18 sales does not mean that no market exists which a competitor can attempt to monopolize. A manufacturer can attempt to monopolize a market by eliminating competition through predatory actions regardless of the product's sophistication and the limited number of its potential customers. The record does not indicate as a matter of law that the military aircraft industry enjoys some sort of natural monopoly that renders inapplicable the premise of the antitrust laws that competition will assure the consumer the best product at the lowest price.

The Record is replete with evidence regarding the competitive nature of the military aircraft industry. The Air Force and Navy competitions alone are evidence of the

---

**32.** This reading of the decision is corroborated by the absence of any direct immunity analysis or case law references in the opinion and by the fact that McDonnell did not explicitly argue for immunity in the lengthy memorandum it submitted in support of its motion for summary judgment.

**33.** In the district court's words:

The concern of product and geographic market from the traditional antitrust viewpoint becomes unimportant here for one very basic reason. The United States Government has the absolute and over-riding control of both the production and sales potential of the product that brings these parties into vitriolic conflict.

What strikes the Court under such circumstances is that there is not the "trade or commerce among the several States, or with foreign nations" essential to antitrust concerns of monopolization including the critical inquiry here—attempt to monopolize. The

United States Government *is the market* concerned with production and distribution of weapons systems for governmental military establishments. As such, this differs from the basic thrust of antitrust laws applicable to governmental procurement practices in competition with consumer enterprises buying goods generally available in the marketplace.

... No single group of producers has any power to expand a market share beyond that considered by the United States Government in the implementation of domestic defense and foreign policy which is in the best interest of its citizens.

Political considerations aside, the monopoly, if any, enjoyed or threatened by MDC is a governmental creation outside the reaches of the Sherman Act Section 2.

498 F.Supp. at 1123 (footnote omitted) (emphasis in the original).

competitive process fostered by the Government to ensure its choice of the best weapons system at the lowest cost. In foreign F–18 markets, the Government's role is limited to determining what technologies may be exported to what countries. Once this determination is made, the Government allows the foreign buyer to choose freely between the competing offerings of exportable technologies.

2. Implied immunity: To the extent, if any, that the district court's decision can be viewed as a determination that Congress intended to confer blanket antitrust immunity on private conduct in the military aircraft industry by virtue of its extensive regulation of that industry, the decision is in error. Although there are no reported antitrust decisions involving this industry, treatment of the immunity question in regard to other regulated industries is instructive.[34]

 Courts have generally framed the immunity issue in terms of whether Congress intended to repeal the antitrust laws with respect to the particular industry when it enacted the regulatory scheme. *Phonotele, Inc. v. American Tel. & Tel. Co.,* 664 F.2d 716, 726, 731–32 (9th Cir.1982) (as amended). *See generally* Comment, *The Application of Antitrust Law to Telecommunications,* 69 Calif.L.Rev. 497, 505–14 (1981). Antitrust immunity is disfavored and "can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system." *National Gerimedical Hospital v. Blue Cross of Kansas City,* 452 U.S. 378, 388, 101 S.Ct. 2415, 2421, 69 L.Ed.2d 89 (1981), *quoting United States v. National Association of Securities Dealers,* 422 U.S. 694, 719–20, 95 S.Ct. 2427, 2442–43, 45 L.Ed.2d 486 (1975). Pervasive regulation of an industry alone is insufficient to confer blanket immunity on every action taken within the industry. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 372–75, 93 S.Ct. 1022, 1027–28, 35 L.Ed.2d 359 (1973); *United States v. R.C.A.,* 358 U.S. 334, 346, 79 S.Ct. 457, 464, 3 L.Ed.2d 354 (1959). Immunity is especially disfavored where the antitrust implications of a business decision are neither compelled nor explicitly approved by a governmental regulatory body. *Gerimedical Hospital,* 452 U.S. at 389, 101 S.Ct. at 2421–22; *National Association of Securities Dealers,* 422 U.S. at 730–34, 95 S.Ct. at 2448–50; *Gordon v. New York Stock Exchange,* 422 U.S. 659, 689–90, 95 S.Ct. 2598, 2614–15, 45 L.Ed.2d 463 (1975). Immunity from the antitrust laws is justified only where necessary to ensure that the regulatory scheme works, and even then only to the minimum extent necessary. *Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963).

 Applying these standards to the present case demonstrates the inappropriateness of granting blanket immunity, especially at the summary judgment stage. Although both McDonnell and the district court speak at length about the extensive matrix of federal regulations under which the military aircraft industry operates, neither points to a single instance in which the predatory conduct alleged by Northrop was either compelled or directly approved by a governmental body.

 As we noted in rejecting a similar immunity claim in *Phonotele:*

Antitrust immunity is not conferred by the bare fact that defendants' activities might be controlled by an agency having broad powers over their conduct. There

---

**34.** In looking at the treatment accorded other regulated industries, we are cognizant of Professor Sullivan's warning that:

It is important to recognize that there is no single conception which defines the scope of the exemption for a regulated industry. Although one can draw on case law from one industry for guidance as to outcome in another, there are, in a sense, as many sets of exemption doctrines as there are industries subject to state or federal regulation. In each industry the process of accommodating regulatory doctrine to antitrust doctrine is responsive to particulars such as those here referred to and, in some degree no doubt, to the degree of confidence which the court has in the quality of the regulatory performance by the particular regulatory agency.

*Antitrust, supra,* § 239 at 743–44.

is no general presumption that Congress intends the antitrust laws to be displaced whenever it gives an agency regulatory authority over an industry.... the area of immunity from antitrust laws is not coterminous with areas of agency jurisdiction or agency expertise.

664 F.2d at 729 (citations omitted). A regulatory mandate sufficient to confer implied antitrust immunity may in some cases exist where there is explicit congressional approval of the challenged conduct and its ultimate anticompetitive effect, and there is no inconsistency or "plain repugnancy" between the conduct and the express policies of the regulating body. *Id.* at 731–32. As in *Phonotele,* no such mandate is evident here.

■ The principal regulatory provisions pertaining to the military aircraft industry are the International Security Assistance and Arms Export Control Act ("ISAAEC Act"), 22 U.S.C. §§ 2751 *et seq.,* implemented, *inter alia,* by the International Traffic In Arms Regulations ("ITARS"), 22 C.F.R. §§ 121.01 *et seq.* (1981), and the Armed Services Procurement Act ("ASP Act"), 10 U.S.C. §§ 2301 *et seq.,* implemented by ASP Regulations ("ASPR"), 32 C.F.R. §§ 1–100 *et seq.* (1981). These provisions contain no affirmative indication that Congress intended to modify or eclipse the application of the antitrust laws to the military aircraft industry. Indeed, there are several indications that Congress intended private conduct in the industry to be subject to the antitrust laws. For instance, the ITARS require the inclusion of a clause in all technical assistance agreements that expressly acknowledges that license approval by the Office of Munitions Control is not to be construed as "passing on the legality of the agreement from the standpoint of antitrust laws." 22 C.F.R. § 124.11(d) (1981). Similarly, the ASP Act provides that a military procuring agency must notify the Attorney General whenever the agency has reason to believe that a "violation of the antitrust laws" has occurred. 10 U.S.C. § 2305(d). Finally, ASPR § 4–117, which describes and authorizes "contractor team arrangements" and was the basis for the agreements now in issue, provides that "[t]hese [teaming] policies do not authorize arrangements in violation of anti-trust statutes ...."[35] ASPR § 4–117(b).

The Court held in *Otter Tail* that because the regulatory scheme in question preserved the right of voluntary action by private actors, its pervasiveness could not be construed to mean that the scheme was intended to supplant the antitrust laws. 410 U.S. at 373, 93 S.Ct. at 1027. A similar conclusion is warranted in this case. Where, as here, the challenged conduct is the product of the regulated business' independent initiative and choice, it is properly subject to antitrust scrutiny. *Phonotele,* 664 F.2d at 735 n. 49.

■ 3. Prima facie case of attempt to monopolize: In addressing this issue, it is appropriate to bear in mind the admonition that summary judgments are most disfavored in antitrust cases where, as with this issue, "motive and intent play leading roles." *California Steel & Tube,* 650 F.2d at 1003. At least two elements of proof are indispensable to make out a prima facie case of attempt to monopolize: (1) specific intent to control prices or destroy competition, and (2) predatory conduct designed to accomplish that unlawful purpose. *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 669 (9th Cir.1980); *Greyhound Computer Corp. v. IBM Corp.,* 559 F.2d 488, 504 (9th Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). Although this court has periodically stated that dangerous probability of successful monopolization is also an indispensable element, *e.g., William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1027

---

**35.** Another factor militating against immunity is the apparent inadequacy or nonexistence of agency structures to remedy anticompetitive behavior in the military aircraft industry. *See Carnation Co. v. Pacific Westbound Confer-* *ence,* 383 U.S. 213, 224, 86 S.Ct. 781, 787, 15 L.Ed.2d 709 (1966), *modified,* 383 U.S. 932, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966); *Phonotele,* 664 F.2d at 734–35. *See also, Comment, supra,* 69 Calif.L.Rev. at 511.

(9th Cir.) (as amended), *cert. denied,* —— U.S. ——, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982); *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 853 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978), there is also Ninth Circuit authority for the view that probability of success is merely circumstantial evidence of intent. *E.g., Forro Precision, Inc. v. IBM Corp.,* 673 F.2d 1045, 1059 (9th Cir.1982); *Blair Foods, Inc.,* 610 F.2d at 669; *Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 474 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).[36] We need not add further fuel to the controversy by adding our opinion regarding the inquiry's proper significance, because, as discussed below, there was sufficient evidence of McDonnell's probability of success to avoid summary judgment. Finally, evidence of market power, while not essential, may suggest the existence of specific intent to monopolize. *Janich Bros.,* 570 F.2d at 853. The interplay between these elements is exhaustively discussed in *Continental Baking,* 668 F.2d at 1027–31 ("Each element interacts with the others in significant and unexpected ways", *id.* at 1027).

■ Although specific intent may be demonstrated by direct evidence of unlawful design, if corroborated, *Continental Baking,* 668 F.2d at 1028, intent is, for practical reasons, more commonly proven through circumstantial evidence such as by inference from predatory conduct and market power. *Forro Precision,* 673 F.2d at 1059; *California Computer Products v. IBM Corp.,* 613 F.2d 727, 736–37 (9th Cir.1979). The combination of direct and circumstantial evidence of McDonnell's intent was sufficient to avoid summary judgment. The memoranda prepared by top McDonnell executives offer strong direct evidence of McDonnell's alleged intent to monopolize. The record also contains evidence that McDonnell possesses great leverage in the

relevant market and, through its allegedly predatory actions, has a dangerous probability of successfully monopolizing that market. These latter factors offer additional evidence in support of Northrop's allegation of monopolistic intent. *See Blair Foods,* 610 F.2d at 669.

■ Northrop's assertions in the pleadings of predatory conduct are also adequate to avoid summary judgment. We cannot accept McDonnell's contention that its alleged breaches of the agreements, fraud in the inducement, and various other unfair practices could not be found predatory in the circumstances of this case. The alleged activity is clearly conduct "without legitimate business purpose." *Janich Bros.,* 570 F.2d at 853. McDonnell's argument is unpersuasive for two reasons. First, McDonnell appears to concede that this alleged conduct would be predatory if, as we have already determined, it enjoyed market power. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 925 (9th Cir.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). Second, McDonnell focuses too closely on each of the individual practices complained of without reference to the intent motivating them or to their overall effect on Northrop's ability to remain McDonnell's principal competitor in the F–18 market. *Cf. Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962) (plaintiff should be given "the full benefit of [its] proof without tightly compartmentalizing the various factual components . . . .").

## V.

### McDonnell's Cross-Appeal

McDonnell concedes that most of its counterclaim is a "mirror image" of Northrop's complaint and that the disposition of one should be consistent with the other.

---

**36.** The significance of the dangerous-probability-of-success inquiry "has been controversial . . . within this circuit." *Hunt-Wesson Foods,* *Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 925 (9th Cir.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981).

The disposition of the motions to dismiss and for summary judgment of Northrop's complaint dictated that the counterclaim be treated similarly in that it was subject to the same perceived flaws. In light of our reversal of the district court's rulings on Northrop's claims, it is necessary to remand for further consideration of the counterclaim.[37]

## VI

### Conclusion

We reverse the district court's dismissal and summary judgment rulings as to Northrop's complaint and McDonnell's counterclaim; affirm the denial of the motion to modify finding of fact # 31;[38] and remand the matter for further proceedings consistent with this opinion.

REVERSED, in part; AFFIRMED, in part; and REMANDED.

---

37. In the two limited aspects of the counterclaim that can arguably be construed as non-mirror images of Northrop's claims, McDonnell essentially sought an affirmative declaration of what the court held below. Had we affirmed the district court in regard to Northrop's complaint, there may have been some justification for treating those two claims as non-mirror images. Given the present posture of the case, however, summary treatment of those aspects of the counterclaim is unwarranted.

38. McDonnell contends that it was clearly erroneous for the district court to strike the words "Northrop claims that" from the beginning of the second sentence of McDonnell's proposed finding of fact # 31. The finding goes on to say that both parties intended the agreements to limit McDonnell to marketing carrier-suit-

able aircraft and Northrop to land-based aircraft. The district court denied McDonnell's motion to reinstate the deleted phrase. Although conceding that the phrase "is not material to the [district] court's orders", McDonnell argues that the deletion is inconsistent with other findings that the parties intended different interpretations of the Agreements and sought different relief based upon their respective interpretations.

McDonnell's objection to the deletion is apparently aimed at protecting itself from being caught in contradictory positions in responding to Northrop's claims and in pressing its own counterclaims. Our disposition of this appeal renders this fear more illusory than real. For this and other reasons, we find no abuse of discretion.