The **VOLLRATH COMPANY,**
Plaintiff–Appellant,

v.

**SAMMI CORPORATION; Ken Carter Industries, Inc.; Sammisa (America) Corp., Defendants–Appellees.**

No. 90–55201.

United States Court of Appeals, Ninth Circuit.

Argued May 9, 1991.

Submission Deferred May 9, 1991.

Resubmitted Aug. 7, 1991.

Submission Withdrawn July 27, 1993.

Resubmitted Nov. 19, 1993.

Decided Nov. 29, 1993.

William P. Tedards, Jr., Washington, DC, for plaintiff-appellant.

Thomas G. Bailey, Jr., Whitman & Ransom, New York City, for defendants-appellees.

Before: HUG, NORRIS, and LEAVY, Circuit Judges.

## OPINION

HUG, Circuit Judge:

Vollrath Company ("Vollrath") appeals the district court's order granting the defendants' motion for judgment notwithstanding the verdict in Vollrath's antitrust action. Vollrath contends there was sufficient evidence from which the jury could have concluded that the defendants violated sections 1 and 2 of the Sherman Antitrust Act by a predatory pricing scheme for stainless steel mixing bowls and by restricting output in Korea of stainless steel steamer cookware. Vollrath further contends there was sufficient evidence from which the jury could reasonably have concluded the defendants' pricing of the stainless steel mixing bowls violated the California Unfair Trade Practices Act. Vollrath also asserts that the district court erred when it barred Vollrath from amending its complaint to allege a claim for tortious interference with a contractual and business relationship. We affirm the district court's judgment.

### I.

#### FACTS

The parties to this dispute include a number of corporations engaged in the manufacture and distribution of stainless steel mixing bowls and steamers. Vollrath, a Wisconsin company, was engaged in the business of importing stainless steel steamers and mixing bowls purchased from companies in Korea. Sammi Corporation ("Sammi") is a large Korean trading company that purchases a large variety of Korean goods for export to the United States and other countries. Among the products exported are stainless steel steamers (which are used in the kitchen on stove burners to cook food by steaming) and stainless steel mixing bowls (which are used in the kitchen for preparation and storage). Sammisa (America) Corporation ("Sammi America") is Sammi's United States subsidiary, which is primarily engaged in the importation and sale of industrial steel products. Ken Carter Industries is a subsidiary of Sammi America. Ken Carter Industries imports and sells stainless steel steamers and mixing bowls exported by Sammi, which are the subject of this action.

Vollrath sued Sammi, Sammi America, and Ken Carter Industries for violating sections 1 and 2 of the Sherman Act and section 2(a) of the Clayton Act. Vollrath's complaint also included charges that the defendants violated California Bus. & Prof.Code §§ 17043 and 17044. Before trial, Vollrath attempted to amend its complaint so as to submit the additional charge that Sammi's output restriction gave rise to a claim of tortious interference under California law. However, on March 10, 1989, the first day of trial, the district court ruled that Vollrath would not be able to proceed with its tortious interference charge. The trial continued until April 5, 1989 and on April 11, 1989, the jury returned a verdict in favor of Vollrath on all of the federal and state claims. The jury awarded $9,478,676 in federal damages and $711,803 in state damages, making the total award of damages, after trebling the award on the federal claims, $29,147,831.

The defendants moved for a judgment notwithstanding the verdict ("JNOV") and for a new trial on July 17, 1989. On November 15, 1989, the district court informed the parties the JNOV motion would be granted but that the court would reserve judgment on the motion for new trial until the appeal from the JNOV was resolved. The court entered its

judgment granting the JNOV motion on December 27, 1989. Vollrath filed a notice of appeal on January 22, 1990.[1]

## II.

### JURISDICTION

Initially, we face a jurisdictional question. Rule 50(c) of Federal Rules of Civil Procedure requires that, when a motion for a new trial is joined with a motion for JNOV or is prayed for in the alternative, the district court is required to issue a conditional ruling on the new trial motion.[2] The district court in this instance did not issue an alternate ruling as required by Fed.R.Civ.P. 50(c) but, rather, reserved its ruling on the new trial until after the appeal from the JNOV was resolved. There is no doubt that this is error, but the question becomes whether this deprives us of appellate jurisdiction. Rule 50(c) does not specify the consequences for failure to issue a conditional ruling on the new trial motion. Specifically, Rule 50(c) does not indicate that such a conditional ruling is a prerequisite to appellate jurisdiction.[3]

In considering whether the failure to comply with the requirements of Rule 50(c) deprives this court of appellate jurisdiction, we must consider Rule 50(c) itself and also Fed. R.App.P. 4(a)(4). The authorities prior to the 1979 amendment adopting Fed.R.App.P. 4(a)(4) are in general agreement that the district court's failure to rule on a new trial motion in the alternative is, at most, a procedural flaw that does not affect appellate jurisdiction.

In at least two cases, this court has previously addressed the merits of an appeal after explicitly noting that the trial court failed to issue a conditional ruling pursuant to Fed. R.Civ.P. 50(c). In both *Cockrum v. Whitney*, 479 F.2d 84, 85 (9th Cir.1973), and *Gordon Mailloux Enterprises, Inc. v. Firemen's Insurance Co. of Newark*, 366 F.2d 740, 742 (9th Cir.1966), this court addressed the merits of an appeal notwithstanding the trial court's failure to issue a conditional ruling and then subsequently remanded the cause for a ruling on the new trial motion. This approach is consistent with that of other authorities which suggest it may be proper for a court of appeals either to rule on the merits of an appeal or to decide the pending new trial motion when a district court fails to comply with Rule 50(c). *See Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1229 (3d Cir.1989) (appeals court should treat new

---

1. Vollrath does not contest on appeal the granting of the JNOV on the claim under section 2(a) of the Clayton Act.

2. Effective December 31, 1991, Rule 50 of the Federal Rules of Civil Procedure was amended. A motion for "directed verdict" is redesignated as a motion for "judgment as a matter of law," and if not granted before submission to the jury, it is deemed to have been submitted subject to a later determination of the legal questions upon a motion for renewal of that motion. Thus, the prior terminology of such a renewed motion as a motion for judgment notwithstanding the verdict ("JNOV") has been replaced as a renewal of the motion for judgment as a matter of law. The operation of Rule 50(c) remains unchanged, though the reference is now to a judgment as a matter of law rather than a judgment notwithstanding the verdict. Because the motions here involved were made prior to the 1991 amendment, we shall continue to use the term JNOV and quote the language from Rule 50(c) as it then existed. We note, however, that our interpretation of Rule 50(c) is equally applicable to the new terminology. We also note that the standard for granting the post-verdict motion is the same whether designated as a JNOV or a

renewed motion for judgment as a matter of law. The change merely emphasizes that the grounds for the motion must have been stated in the *motion made prior to submitting the case to the* jury.

3. Rule 50(c) at the time of the order provided:
Conditional Rulings on Grant of Motion.
(1) If the motion for judgment notwithstanding the verdict, provided for in subdivision (b) of this rule, is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered. In case the motion for a new trial has been conditionally denied, the appellee on appeal may assert error in that denial; and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.

trial motion as granted); *Mays v. Pioneer Lumber Corp.*, 502 F.2d 106, 109–110 (4th Cir.1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975). *See also* 9 Wright & Miller, *Federal Practice and Procedure*, § 2539 (Supp.1993) (citing *Mays* with approval); 5A Moore's *Federal Practice* ¶ 50.12 at 50–105 (court may order either entry of judgment or a new trial or remand case to trial court for reconsideration of new trial motion).

A somewhat closer question is presented by the subsequent amendment to Fed. R.App.P. 4(a). That provision was amended in 1979 so as to include subdivision 4(a)(4), which provides:

> If a timely motion under Federal Rules of Civil Procedure is filed in the district court by any party: (i) for judgment under Rule 50(b); (ii) under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (iii) under Rule 59 to alter or amend the judgment; or (iv) under Rule 59 for a new trial, the time for appeal for all parties shall run from the entry of the order denying a new trial *or granting or denying any other such motion*. A notice of appeal filed before the disposition of any of the above motions shall have no effect. A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion as provided above. . . .

(Emphasis added.) Because the order granting the JNOV under Rule 52(b) is an order granting "any other such motion," the time for appeal commences to run. A notice of appeal is not rendered premature because no alternate ruling on the motion for a new trial has been made. The express words of Rule 4(a)(4) do not require such a result and the policy behind the rule does not counsel that result.

Rule 4(a) prevents a party from appealing a judgment when a pending post-judgment motion renders the judgment non-final. Fed.R.App.P. Rule 4(a). Specifically, the Advisory Committee note to the 1979 amendment to Rule 4(a)(4) makes clear that the rule was intended to prevent the appellate

court from assuming jurisdiction in a case "while the district court has before it a motion *the granting of which would vacate or alter the judgment appealed from.*" Fed. R.App.P. 4(a)(4) Advisory Committee's note to 1979 amendment (emphasis added). When a district court grants a motion for JNOV, that order is the final judgment of the court. The district court does not have before it a motion "the granting of which would vacate or alter that judgment." The judgment based on the JNOV could be altered only by reversal on appeal, not by any ruling by the district court.

We therefore conclude that we may properly exercise appellate jurisdiction over this case.

### III.

#### PLAINTIFF'S LEGAL THEORIES

Vollrath's action was submitted to the jury on several legal theories. The theories argued on appeal are:

(1) An attempt to monopolize in violation of section 2 of the Sherman Act, based upon

> (a) Ken Carter's predatory pricing of stainless steel mixing bowls, and

> (b) Sammi's invoking design registration rights to prevent another exporter in Korea from exporting stainless steel steamers.

(2) Conspiracy to

> (a) restrain trade in violation of section 1 of the Sherman Act, and

> (b) monopolize in violation of section 2 of the Sherman Act.

(3) Violations of the California Unfair Trade Practices Act, Cal.Bus. & Prof.Code § 17000 *et seq.*

Vollrath also raises for the first time on appeal a contention that the restriction of output by Sammi was a "naked restraint of trade" and a *per se* violation of Section 1 of the Sherman Act. Vollrath also asserts as error the district court's order denying Vollrath's motion, on the eve of trial, to amend its complaint to allege a state law claim of

tortious interference with a contractual and business relationship.

█ In reviewing a district court's order granting JNOV, we review the decision *de novo,* applying the same standard as the district court. *The Jeanery, Inc. v. James Jeans, Inc.,* 849 F.2d 1148, 1151 (9th Cir. 1988). A JNOV is proper if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's. *Venegas v. Wagner,* 831 F.2d 1514, 1517 (9th Cir.1987).

The district court, in a thorough and carefully reasoned 54–page unpublished opinion, analyzed the evidence presented in light of the governing law, and concluded that the evidence could not support the verdict and that a judgment for the defendants was required. We affirm essentially for the reasons expressed in that unpublished opinion.

## IV.

### *ATTEMPTED MONOPOLIZATION*

█ Vollrath's claims of attempted monopolization are based upon two theories: (1) that Ken Carter engaged in predatory pricing of stainless steel mixing bowls, and (2) that Sammi invoked Korean design registration rights to block another exporter in Korea from exporting stainless steel steamers. In order to establish an attempt to monopolize "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* —— U.S. ——, ——––——, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993).

### A. *Predatory Pricing of Stainless Steel Mixing Bowls*

█ Two prerequisites to recovery under section 2 of the Sherman Act for predatory pricing must be proved:

1. "[A] plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs."

*Brook Group, Ltd. v. Brown & Williamson Tobacco Corp.,* —— U.S. ——, ——, 113 S.Ct. 2578, 2587, 125 L.Ed.2d 168 (1993) (footnote omitted).

2. "[T]he competitor had a . . . dangerous probability[ ] of recouping its investment in below-cost prices."

*Id.* at 2588.

Economic reality is that, generally, price reduction is the very essence of competition. Thus, care must be taken in drawing the line between pricing that enhances competition and predatory pricing that is designed to eliminate competition. The Supreme Court has noted that predatory pricing is "rarely tried, and even more rarely successful." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 589, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986). The reason is that, in order for the business entity to eliminate competition by pricing below cost, it must forego short-term profits long enough to drive competitors from the market and then maintain monopoly power long enough to recoup the losses and realize additional gain. *Id.* at 588–89, 106 S.Ct. at 1356–57. Thus, "the predator must make a substantial investment with no assurance it will pay off." *Id.* at 589, 106 S.Ct. at 1357.

█ In this case, the alleged predatory pricing relates to the stainless steel mixing bowls exported by Sammi and sold by Ken Carter. The basis for the claim is that Ken Carter sold the mixing bowls below its average variable cost. As the district court noted, the basic defect is that the plaintiff presented a mismatch of evidence to support the claim. It sought to show below-cost sales by Ken Carter as an independent entity by imputing costs from Sammi and Sammi America and Ken Carter as a combined unit. If Ken Carter is viewed as an independent unit, then we must consider only the costs actually incurred by Ken Carter to determine if it sold below its costs. If Ken Carter, Sammi, and Sammi America are considered as a combined unit, then the appropriate consideration is the costs of the combined group to determine if the combined group sold below its costs.

We first consider the claim viewing Ken Carter as an independent unit. Vollrath contends there was sufficient evidence from which the jury could have concluded that Ken Carter priced its stainless steel mixing bowls below average variable cost. At trial, Vollrath sought to show that during the period from June 1981 to May 1982, Ken Carter sold $2.8 million worth of Sammi products at prices which were approximately 28% below its variable costs.

The facts underlying Vollrath's claim are as follows: Prior to November 1981, Sammi America advanced over $1 million worth of merchandise to Ken Carter on credit. In November of 1981, Sammi America purchased Ken Carter. During the ownership transaction, the unpaid debt to Sammi America reached $3 million. In 1984, Sammi America advanced another $2 million for working capital. James Kim, from Ken Carter, testified that the unpaid debt was treated by the companies as investment capital which was not to be paid back. Vollrath objected to the characterizations of the transactions and offered the expert testimony of Dr. Buckley to show the average variable cost of the products sold by Ken Carter was higher than the company claimed.

Dr. Buckley's testimony does not support a finding that Ken Carter priced its product line of mixing bowls below the average variable cost, with the exception of one item in its product line. The testimony relied in large part on the concept of "imputed interest," which was an estimate of the cost of the funds made available to Ken Carter in order to permit Ken Carter to purchase inventory from Sammi. The crux of Dr. Buckley's testimony was that Ken Carter would have had to borrow money from other sources and pay for interest on the borrowed money in order to purchase the inventory.

Dr. Buckley's testimony, however, is insufficient as a matter of law. Even if Ken Carter did not pay interest on the funds or credit advanced, it would not mean that the average variable cost of the goods was higher. The absence of interest would only mean that Ken Carter received favorable treatment from Sammi, not that Ken Carter actually incurred a cost. Without proof that Ken Carter somehow incurred a cost, the concept of imputed interest is unsound. There was evidence that in 1983 and 1984 Ken Carter did sell one item of its product line below costs without considering Dr. Buckley's imputed interest. This was the five-piece mixing bowl set. This would be scant proof of an intent to monopolize.

The more serious flaw in the whole theory of viewing Ken Carter as an individual unit engaged in predatory pricing is that there was no possibility of Ken Carter achieving monopoly power by predatory pricing because it controlled only 10% of the market. There is no danger of monopoly power, and there certainly would be no hope of recouping losses from below-cost pricing.

If we consider Ken Carter as a part of an integrated entity with Sammi and Sammi America, both before and after its acquisition by Sammi America in 1981, there also is a lack of proof of predatory pricing. The evidence cannot sustain a finding that the integrated entity sold below its average variable costs because there was no evidence of Sammi's costs. Vollrath's entire argument is based upon the contention that the subsidiary corporation, Ken Carter, sold below its average variable costs and that this was sufficient for a jury to find predatory pricing. However, to show below-cost sales by the integrated entity, the costs of the integrated entity must be proved. Furthermore, there was insufficient evidence from which the jury could reasonably conclude that there was a dangerous probability of achieving monopoly power. There also was no showing from the evidence that the defendants could have recouped any losses from below-cost pricing.

The Supreme Court recently stated that, "[D]emonstrating the dangerous probability of monopolization in an attempt case ... requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Spectrum Sports*, —— U.S. at ——, 113 S.Ct. at 892. As the district court noted, "No matter how the market is defined—and certainly plaintiff did not define it—the ease of entry into it and the number of potential participants on every level of it abundantly demonstrates that recoupment of the monopolist would

never be possible. This is the classic case for the application of *Matsushita*." Vollrath's expert testimony was not based upon sufficient evidence adduced at trial concerning market power or market facts to justify a conclusion that there was a dangerous probability of recouping an investment in below-cost prices. As noted in the *Brown & Williamson* decision:

> When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict. Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them.

*Brown & Williamson,* —— U.S. at ——, 113 S.Ct. at 2598 (citation omitted).

## B. *Design Rights to Steamers*

█ The evidence at trial showed the existence and function in Korea of the Korean Holloware Association. This association through a 13–member Pattern and Design Registration Committee grants pattern and design registration rights for particular products to Korean manufacturers and trading companies based on shape, appearance, and color of the products. The 13 members of the committee are from the following groups: four members from manufacturers, four members from trading companies, one member from the Korean Holloware Association, one member from the Association of patent attorneys, and three members from Korean government organizations.

A trading company, such as Sammi, can only hold a pattern design right jointly with a manufacturer. Sammi was a co-holder of a pattern and design registration with a manufacturer, Dae Sung, for certain stainless steel steamers in the years 1983 and 1984. Vollrath tried to have its steamer design registered but could not do so because a similar design was already registered to Sammi and Dae Sung.

Sammi and Dae Sung sought to invoke their design registration rights to prevent another trading company, Dae Lim, from shipping its steamers. This lasted for only a three-month period from October, 1983 to January, 1984. Sammi and Dae Sung, although still claiming infringement of their design rights, waived their rights and Vollrath received steamers in early January, 1984.

This three-month assertion of Korean design rights constitutes Vollrath's sole claim for attempted monopolization of a market Vollrath contended was the stainless steel steamer market. There are many evidentiary deficiencies in establishing this claim, which the district court pointed out. There was no evidence that the assertion of design rights in Korea was done with an intent to monopolize a stainless steel steamer market in the United States. It was also highly doubtful that stainless steel steamers constituted a relevant market. Vollrath's expert testified that these steamers could be treated as a product distinct from other steamers, such as those made from aluminum or other materials, and "in a sense" could be viewed as constituting "a market of their own." This is hardly a firm conclusion of a separate market for stainless steel steamers. Furthermore, even this inconclusive opinion was not reasonably based on sound data. There was no detailed examination of market data or any analysis of cost, comparable usage, or comparative features of other competing products. The opinion was based on limited anecdotal evidence.

The most significant deficiency in the claim, also noted by the district court, is that no evidence of a dangerous probability of monopoly power in the United States resulted from this three-month delay in shipment of steamers to Vollrath. This is particularly true in light of the Supreme Court's recent decisions in *Spectrum Sports* and *Brown & Williamson.* There was insufficient evidence concerning the relevant product and geographic market and Sammi's economic power in that market.[4]

---

**4.** Vollrath also argues on appeal that Sammi and nonparty Dae Sung engaged in a naked restraint of trade in Korea and that this constituted a *per se* violation of section 1 of the Sherman Act.

This theory was not presented in the district court, and we decline to consider it on appeal. *See Kline v. Johns–Manville,* 745 F.2d 1217, 1221 (9th Cir.1984).

## V.

### CONSPIRACY CLAIMS

The district court properly held that there could be no conspiracy among Sammi, Sammi America, and Ken Carter, after the latter's acquisition, relying on *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Under *Copperweld*, companies under common ownership and control cannot initiate Sherman Act conspiracy violations among themselves. Vollrath argues that *Copperweld* is inapplicable because the evidence demonstrates Ken Carter was engaging in predatory pricing even before Sammi, Sammi America, and Ken Carter were combined.

Vollrath's claim of conspiracy in the district court was based solely on an alleged conspiracy among Ken Carter, Sammi, and Sammi America and was submitted to the jury on that basis. On appeal, Vollrath seeks to expand the number of alleged conspirators to non-defendants, Dae Sung and the Korean Holloware Association. Here again, we decline to consider this expanded allegation of a conspiracy when asserted for the first time on appeal. *See Johns–Manville*, 745 F.2d at 1221.

We are thus concerned with whether there was a conspiracy among Sammi, Sammi America, and Ken Carter before Ken Carter became a subsidiary of Sammi America. Vollrath sought to prove that Sammi America acquired Ken Carter for the purpose of launching a predatory pricing program. The district court concluded that the record does not support any inference of an anti-competitive conspiracy prior to Ken Carter's acquisition. Although there were advances of credit for merchandise sold by Sammi and loans from Sammi America, and Sammi dealt with Ken Carter as supplier and distributor, the district court held that there was no evidence of anti-competitive purpose. Vollrath contends that Sammi's motive before and after acquiring Ken Carter was to engage in below-cost pricing so as to monopolize the stainless steel mixing bowl market.

It is worth repeating the requirements to establish such a competitive injury as set forth by the Supreme Court in *Brown & Williamson*:

> First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs.
>
> . . . .
>
> The second prerequisite to holding a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had a reasonable prospect, or under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices.

—— U.S. at —— – ——, 113 S.Ct. at 2587–88.

For the reasons earlier expressed, there was insufficient evidence of below-cost pricing for the Sammi group because the costs for the Sammi group were never proved. Sammi was the alleged perpetrator and beneficiary of such a conspiracy; therefore, the costs of the whole group are the relevant costs.

More significantly, for the reasons earlier expressed, there is insufficient evidence to support a conclusion that there was a reasonable prospect or a dangerous probability that Sammi could have recouped the losses from any below-cost pricing. There was no evidence analyzing the nature of the market, its participants, ease of entry, and the defendants' ability to lessen or destroy competition in that market.

## VI.

### VIOLATION OF CALIFORNIA LAW

Vollrath next contends there was sufficient evidence showing that the Sammi group violated the California Unfair Trade Practices Act.

The Cal.Bus. & Prof.Code § 17043 prohibits the sale, within the state, of any product at less than the product's cost for the purpose of injuring competitors or destroying competition. Similarly, Cal.Bus. & Prof. Code § 17044 prohibits the use of a "loss

leader." [5] Vollrath did not present any evidence to the jury that Sammi, Sammi America or Ken Carter intended to sell or actually made any below-cost or loss-leader sales in California. The district court properly granted JNOV on this claim.

### VII.

*MOTION TO AMEND COMPLAINT*

██ Vollrath contends the district court erred when it denied Vollrath's motion to amend its complaint to include a claim for tortious interference with a contractual or business relationship. This contention is meritless.

██ A motion for leave to amend is addressed to the sound discretion of the district court. *See Thomas–Lazear v. FBI*, 851 F.2d 1202, 1206 (9th Cir.1988). Here, Vollrath waited until almost a year after being reinstated as a party to the case before attempting to amend the complaint. Additionally, by the time Vollrath attempted to amend the complaint, the discovery cutoff date had already passed. The district court did not abuse its discretion when it rejected the amendment as untimely. *See id.* at 1206–07.

The district court's judgment is **AFFIRMED.**

---

**5.** Cal.Bus. & Prof.Code § 17030 defines a "loss leader" in part as: "any article or product sold at less than cost: (a) Where the purpose is to induce, promote or encourage the purchase of other merchandise; ... (c) Where the effect is to divert trade from or otherwise injure competitors."

