82 F.3d 839
 1996-1 Trade Cases P 71,383, 96 Cal. Daily
Op. Serv. 2946,
96 Daily Journal D.A.R. 4883
METRO INDUSTRIES, INC., Plaintiff-Appellant,
v.
SAMMI CORPORATION, Sammi (America) Corporation; Ken Carter
Industries, Inc., Defendants-Appellees.
 No. 94-56180.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 8, 1996.
Decided April 29, 1996.
 
 William P. Tedards, Jr., Washington, D.C., for plaintiff-appellant.
 Thomas G. Bailey, Jr., John E. Tardera, Whitman, Breed, Abbott & Morgan, New York City, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California; Mariana R. Pfaelzer, District Judge, Presiding. D.C. No. CV-83-07931-MRP.
 Before: POOLE, WIGGINS, and RYMER, Circuit Judges.
 WIGGINS, Circuit Judge:
 
 
 1
 Metro Industries, Inc. ("Metro"), an importer and wholesaler of kitchenware, sued Sammi Corp. ("Sammi"), a South Korean exporting company, and two of its American subsidiaries alleging, inter alia, that a Korean design registration system, which gives Korean holloware producers the exclusive right to export a particular holloware design for three years, constituted a market division that is a per se violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Metro alleges that Sammi used this registration system in 1983 to prevent Metro and other kitchenware importers from acquiring Korean-made stainless steal steamers from any of Sammi's competitors in Korea.
 
 
 2
 Metro appeals the district court's grant of Sammi's motion for summary judgment on Metro's Sherman Act § 1 claim, which was based on the district court record from Vollrath Co. v. Sammi Corp., 9 F.3d 1455 (9th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 2163, 128 L.Ed.2d 886 (1994), a case in which another importer of Korean kitchenware sued Sammi for alleged violations of §§ 1 and 2 of the Sherman Act. We have jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.
 
 FACTS AND PROCEDURAL HISTORY
 
 3
 Metro is an importer and distributor of kitchenware products. Metro started a stainless steel kitchenware business in about 1977, importing mixing bowls from a Korean supplier called Haidong. In 1978 it began to purchase bowls from Sammi, and over the next few years, expanded its business to include other kitchenware. By 1981, importing and selling stainless steel kitchenware constituted Metro's principal business activity.
 
 
 4
 Sammi is a large Korean trading company that purchases a wide variety of finished products, including stainless steel steamers, for export to the United States and other countries. Sammi is a member of the Korea Holloware Association. See Vollrath, 9 F.3d at 1462. This association, through a thirteen-member design registration committee, grants pattern and design registration rights for particular products based on the shape, appearance, and color of the products. Id. The registration committee consists of members from manufacturing companies, trading companies, the Korea Association of patent attorneys, and three members of Korean government organizations. A trading company, such as Sammi, can only hold a pattern design right jointly with a manufacturer. Id. Registration gives the design holder the exclusive right to export a particular design for three years, and the rights can be extended for three additional years.
 
 
 5
 According to Metro, in late 1981, it raised the idea of a line of stainless steel steamers with Sammi, provided Sammi with models, and asked Sammi to develop samples and to prepare to supply the steamers. Sammi registered the steamer design and began to supply Metro with steamers. Metro experienced a disruption of steamer deliveries from Sammi at some time during 1983. Metro alleges that its attempts to order the steamers from another company were blocked by Sammi. Eventually, in late 1983, Metro was able to secure a source of steamers from a Korean company called Sambo and apparently had no further disruptions in its steamer shipments.
 
 
 6
 In December 1983, Metro filed a complaint in the United States District Court for the Central District of California against Sammi and two of its American subsidiaries alleging violations of §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and §§ 2, 3, and 7 of the Clayton Act (15 U.S.C. §§ 13, 14, and 18), and various violations of California law. In June 1984, the claims against Sammi were dismissed for lack of personal jurisdiction.
 
 
 7
 In June 1986, the district court commenced a bench trial on Metro's claims against the two American subsidiaries. The essence of Metro's case against the subsidiaries was that they had engaged in predatory pricing with the intent of monopolizing the stainless steel steamer and mixing bowl markets. After several days of trial on certain issues of the predatory pricing case, the two subsidiaries filed a motion for involuntary dismissal, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, on the grounds that Metro had not presented a prima facie case and could not present such a case with its remaining witnesses. The district court took the Rule 41(b) motion and an earlier motion for summary judgment under advisement and postponed the remainder of Metro's trial pending the court's decisions on Sammi's motions.
 
 
 8
 Meanwhile, a second importer of Korean kitchenware, the Vollrath Company, filed a similar action in the same district court against Sammi and its two U.S. subsidiaries. As in Metro's case, the district court granted Sammi's motion to dismiss for lack of personal jurisdiction. However, in February 1988, the district court granted Vollrath's motion to reconsider the court's jurisdiction over Sammi, and Sammi was reinstated as a defendant in both Vollrath's and Metro's cases. Defendants' 1986 motion for involuntary dismissal was denied without prejudice in May 1988.
 
 
 9
 The trial on Vollrath's claims against Sammi and its subsidiaries for violation of §§ 1 and 2 of the Sherman Act and the California Unfair Trade Practices Act, based on accusations of predatory pricing and output restriction, was conducted during March and April of 1989. On April 11, 1989, the jury returned a verdict in favor of Vollrath, awarding $9,478,676 in damages on the federal claims and $711,803 in damages on state law claims, for a total of over $29 million in damages after trebling the award on the federal claims. On December 27, 1989, however, the district court granted judgment notwithstanding the verdict ("JNOV") in favor of all defendants on all claims.
 
 
 10
 On appeal, we affirmed the district court's JNOV on all of Vollrath's theories. First, we held that the evidence presented could not support Vollrath's claims of attempted monopolization based on a predatory pricing theory. Vollrath, 9 F.3d at 1460-62. Second, we held that Vollrath could not sustain a Sherman Act § 2 attempted monopolization claim against Sammi for its temporary assertion of its rights to a particular rice steamer design, which prevented Vollrath from receiving steamers from another Korean exporter for a three-month period. We found that "[t]here was insufficient evidence concerning the relevant product and geographic market and Sammi's power in that market," making it impossible to find a dangerous probability that Sammi could gain monopoly power over any market in the United States. Id. at 1462.[1] We did not consider Vollrath's claim that Sammi and other exporters in Korea engaged in a naked restraint of trade by establishing the export registration system, allegedly constituting a per se violation of § 1 of the Sherman Act, because Vollrath had not presented that theory to the district court. Id. at 1462 n. 4. The Supreme Court denied certiorari. See --- U.S. ----, 114 S.Ct. 2163, 128 L.Ed.2d 886 (1994).
 
 
 11
 Meanwhile, the defendants in the Metro case filed motions for summary judgment in 1990 after the district court's JNOV but before this court considered Vollrath's appeal. Both sides in the Metro case explicitly agreed that the issues in the Metro and Vollrath cases were essentially the same and that the district court should rely on the Vollrath record along with the limited Metro record in ruling on the motions for summary judgment. The district court ordered the Metro case off calendar, pending our resolution of the Vollrath case.
 
 
 12
 Immediately after our Vollrath decision, the district court scheduled a status conference for the Metro case, held on December 20, 1993. Subsequent to the district court's decision in the Vollrath case, Metro began arguing a new theory-that the Korean design registration system under which Sammi had the exclusive rights to manufacture a particular steamer design constituted a market division that was illegal per se under § 1 of the Sherman Act.[2] In May 1994, Sammi filed a motion to dismiss all claims against Sammi and its subsidiaries pursuant to Rules 52(c) and 56(b) of the Federal Rules of Civil Procedure. Metro filed an opposition and cross-motion for partial summary judgment on the liability portion of the market division claim, relying entirely on the Vollrath record. The district court granted Sammi's motion for summary judgment and denied Metro's cross-motion, finding that Metro had failed to present sufficient evidence to carry its burden on any of its claims.
 
 DISCUSSION
 
 13
 Metro appeals only the district court's grant of summary judgment in favor of Sammi on Metro's Sherman Act § 1 market division claim and the court's denial of Metro's cross-motion for summary judgment. We review a district court's grant of summary judgment de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).
 
 
 14
 Section 1 of the Sherman Antitrust Act, as amended in 1990, reads, in relevant part:
 
 
 15
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.
 
 
 16
 15 U.S.C. § 1 (1994).[3] Metro alleges that the Korean Holloware Association registration system constitutes a "naked" market division agreement, which is per se illegal under the Sherman Act. Thus, Metro argues, an examination of the impact of the registration system on competition in the United States is not necessary to find a violation of § 1.
 
 
 17
 Because conduct occurring outside the United States is only a violation of the Sherman Act if it has a sufficient negative impact on commerce in the United States, per se analysis is not appropriate. Indeed, when the alleged illegal conduct occurred in a foreign country, we must examine the impact on commerce in the United States before we can determine that we have subject matter jurisdiction over a claim. Because the Vollrath panel determined on the same facts before us that the relevant market and Sammi's power within that market had not been sufficiently defined, Metro cannot prove injury to competition based on the Vollrath record and cannot recover on its Sherman Act claim.
 
 
 18
 I. Per Se Treatment is Inappropriate in This Case
 
 
 19
 "Ordinarily, whether particular concerted activity violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason-that is, 'the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.' " Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988) (quoting Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977)). "Certain categories of agreements, however, have been held to be per se illegal, dispensing with the need for case-by-case evaluation." Id. "Such agreements are those that always or almost always tend to restrict competition and decrease output." United States v. Brown, 936 F.2d 1042, 1045 (9th Cir.1991) (internal citations omitted). In general, "[a] market allocation agreement between competitors at the same market level is a classic per se antitrust violation." Id.
 
 
 20
 A. The Korean Registration System is Not Illegal Per Se
 
 
 21
 Where the conduct at issue is not a garden-variety horizontal division of a market, we have eschewed a per se rule and instead have utilized rule of reason analysis. Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1050 (9th Cir.), cert. denied, 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983); see also Cayman Exploration Corp. v. United Gas Pipe Line Co., 873 F.2d 1357, 1360 (10th Cir.1989); see generally 2 Julian O. von Kalinowski et al., Antitrust Laws and Trade Regulation § 6F.03 (1995). In deciding whether to extend the per se rule to a previously unexamined business practice, we are to examine whether "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, .... or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.' " Broadcast Music, Inc. v. Columbia Broadcasting Sys., 441 U.S. 1, 19-20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979) (quotation omitted).
 
 
 22
 The Korean registration system is not a classic horizontal market division agreement in which competitors at the same level agree to divide up the market for a given product. Metro does not point to, and we have not found, a single instance in which an arrangement similar to the Korean manufacturer-exporter design registration system has undergone judicial scrutiny in the Sherman Act context. The novelty of this arrangement, "strongly supports application of rule-of-reason analysis." Northrop, 705 F.2d at 1051; see also United States v. Topco Assoc., Inc., 405 U.S. 596, 607-08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) ("It is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act.").
 
 
 23
 Further, as discussed below, there is no evidence of a negative effect on competition, which also militates against extension of the per se rule. Northrop, 705 F.2d at 1052; Cascade Cabinet Co. v. Western Cabinet & Millwork Inc., 710 F.2d 1366, 1372 (9th Cir.1983). The record reveals that the registration protection was limited to particular designs of a product "based on shape, appearance, and color of the products." Vollrath, 9 F.3d at 1462. The protection extends for only three years, renewable for three additional years. Contrary to Metro's assertions, the record does reveal the output increasing potential of the registration system. Sammi's general manager of housewares indicated that tooling and production of a new product takes several years. Thus, the limited protection could encourage manufacturers to develop and produce new products, knowing that they would have the exclusive right to export a particular design for a limited period of time.
 
 
 24
 Finally, there is no evidence that the purpose of the design registration system was to restrain trade, which also counsels in favor of rule of reason analysis. Northrop, 705 F.2d at 1053. The Korean association was apparently a quasi-governmental group (in that it was sanctioned by the Korean government and three of its thirteen members were representatives of the Korean government) that was formed to ensure product and design quality and to protect from copying. Sammi's general manager of housewares indicated that the system was designed "to promote the manufacturer to develop better quality product, a better quality design, and protect them from copy[ing] by other manufacturers."
 
 
 25
 Accordingly, rule of reason analysis is appropriate in this case.
 
 
 26
 B. Foreign Conduct Cannot Be Examined Under the Per Se Rule
 
 
 27
 Even if Metro could prove that the registration system constituted a "market division" that would require application of the per se rule if the division occurred in a domestic context, application of the per se rule is not appropriate where the conduct in question occurred in another country. Determining whether the registration system was a violation of the antitrust laws would still require an examination of the impact of the system on commerce in the United States. "The Sherman Act does reach conduct outside our borders, but only when the conduct has an effect on American commerce." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582 n. 6, 106 S.Ct. 1348, 1354 n. 6, 89 L.Ed.2d 538 (1986). See also Hartford Fire Ins. Co. v. California, 509 U.S. 764, 796, 113 S.Ct. 2891, 2909, 125 L.Ed.2d 612 (1993) ("[I]t is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States.").[4] According to a leading treatise:
 
 
 28
 [T]he conventional assumptions that courts make in appraising restraints in domestic markets are not necessarily applicable in foreign markets. A foreign joint venture among competitors, for example, might be more "reasonable" than a comparable domestic transaction in several respects: the actual or potential harms touching American commerce may be more remote; the parties' necessities may be greater in view of foreign market circumstances; and the alternatives may be fewer, more burdensome, or less helpful.
 
 
 29
 The fact that foreign conduct would be a per se offense-one that is condemned without proof of particular effects and with little regard for possible justifications in the particular case-when entirely domestic does not call for a fundamentally different analysis. Domestic antitrust policy uses per se rules for conduct that, in most of its manifestations, is potentially very dangerous with little or no redeeming virtue. That rationale would be inapplicable to foreign restraints that, in many instances, either pose very little danger to American commerce or have more persuasive justifications than are likely in similar restraints at home. For example, price fixing in a foreign country might have some but very little impact on United States commerce.
 
 
 30
 1 Phillip Areeda & Donald F. Turner, Antitrust Law p 237 (1978). Thus, the potential illegality of actions occurring outside the United States requires an inquiry into the impact on commerce in the United States, regardless of the inherently suspect appearance of the foreign activities. Consequently, where a Sherman Act claim is based on conduct outside the United States, we apply rule of reason analysis to determine whether there is a Sherman Act violation.
 
 
 31
 II. JURISDICTIONAL INQUIRIES ARE REQUIRED WHEN A SHERMAN ACT CLAIM IS BASED ON FOREIGN CONDUCT
 
 
 32
 When we examine foreign conduct to determine if there is an antitrust violation, our jurisdiction is not a foregone conclusion. "When foreign conduct is involved, the courts customarily appraise its substantive antitrust significance only after deciding whether the Sherman Act asserts jurisdiction over it.... '[J]urisdictional' and 'substantive' inquiries are not wholly independent." Id. We examined the jurisdictional considerations in applying the Sherman Act to foreign conduct in Timberlane Lumber Co. v. Bank of America, 549 F.2d 597 (9th Cir.1976) (Timberlane I ), and Timberlane Lumber Co. v. Bank of America, 749 F.2d 1378 (9th Cir.1984) (Timberlane II ), cert. denied, 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985). Both cases concerned an American lumber producer's Sherman Act claims based on its allegations that Bank of America and several co-conspirators had conspired and acted to preclude a subsidiary of Timberlane from competing in the Honduran lumber market and exporting lumber into the United States.
 
 
 33
 In Timberlane I, we articulated a "jurisdictional rule of reason," to be applied to Sherman Act claims arising out of foreign conduct. The inquiry requires the weighing of the answers to three questions:
 
 
 34
 Does the alleged restraint affect, or was it intended to affect, the foreign commerce of the United States? Is it of such a type and magnitude so as to be cognizable as a violation of the Sherman Act? As a matter of international comity and fairness, should the extraterritorial jurisdiction of the United States be asserted to cover it?
 
 
 35
 549 F.2d at 615. The comity question alone requires the consideration of several elements, including:
 
 
 36
 the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.
 
 
 37
 Id. at 614. The district court had dismissed Timberlane's claim pursuant to Rule 12(b)(6) because it determined that the activities in Honduras had not had a "direct and substantial effect on American foreign commerce." Id. at 615. We found, however, that Timberlane's allegations that the activities "were intended to, and did, affect the export of lumber from Honduras to the United States" and the magnitude of the effect alleged were sufficient to state a claim, and that the jurisdictional dismissal could not be sustained absent an examination of the comity question by the district court. Id. Thus, we reversed and remanded to the district court.
 
 
 38
 Upon remand, the district court allowed additional discovery, and eventually dismissed Timberlane's claim for lack of jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). In affirming the dismissal, we acknowledged "that Rule 56 [summary judgment] treatment is required ... when 'the jurisdictional issue and the substantive issues are so intermeshed that the question of jurisdiction is dependent on decision of the merits.' " Timberlane II, 749 F.2d at 1382 (quoting Thornhill Publishing Co. v. General Tel. & Elec. Corp., 594 F.2d 730, 735 (9th Cir.1979)). While the first two prongs of Timberlane I, the effect on U.S. commerce and the type and magnitude of alleged illegal behavior, would likely require a resolution of the merits of the Sherman Act claim, the third prong, comity considerations, "can involve a policy judgment that requires a consideration only of the facts as alleged." Id. at 1382. Thus while dismissal based on the first two prongs would likely require Rule 56 treatment and an absence of a dispute about material facts, dismissal under Rule 12(b)(1) based on comity considerations is permissible.
 
 
 39
 Turning to the district court's application of the "jurisdictional rule of reason," we found that Timberlane adequately pleaded that there was an actual or intended effect on American foreign commerce and that Timberlane had made the minimal injury allegations necessary to support an a Sherman Act claim, thus satisfying the first two prongs of the Timberlane I test. Id. at 1383. As for the comity prong, we found that the conduct in Honduras at issue was allowed or even encouraged by Honduran law; thus the factor considering "the degree of conflict with foreign law or policy," weighed strongly against Sherman Act jurisdiction. Id. at 1384.[5] Other factors, including the relative insignificance of the actions to the U.S. lumber market compared with the significant impact on the Honduran lumber market, the lack of evidence of intent to affect the U.S. market, and the lack of foreseeability of an effect on the U.S. market, also counseled against jurisdiction. Id. at 1384-85. We concluded that the exercise of federal jurisdiction would not be proper. Id. at 1386.
 
 
 40
 Metro has made sufficient allegations to state a claim under the Sherman Act. Comity considerations are less compelling here than they were in Timberlane. Under Hartford Fire Ins., 509 U.S. at 797-99, 113 S.Ct. at 2910-11, there is no conflict with foreign law or policy because the Korean holloware registration system was not compelled by the Korean government, even though three government representatives serve on the design and pattern registration committee. Though Sammi is a foreign corporation, it apparently does a great deal of business in the United States, so it has assets which could be used to secure any judgment against it. The impact of the registration is felt more in the United States than in Korea because the registration system only limits the export of particular designs, and it was certainly foreseeable that these export restrictions could affect the United States. Considering all the factors, principles of comity and fairness do not deprive this court of jurisdiction.
 
 
 41
 As Timberlane II makes clear, the other two prongs of the "jurisdictional rule of reason" test are substantially intertwined with the merits of Metro's Sherman Act claim. Thus, while we could ultimately determine that we lack subject matter jurisdiction over Metro's Sherman Act claim because of a lack of impact in the United States, such a conclusion would only come after the factual inquiry into markets, market power, and other factors necessary to find a substantive violation of the Sherman Act. By alleging in its complaint that because of Sammi's manipulation of the registration system "existing and potential competition in the relevant markets has been unreasonably restrained and substantially lessened, independent United States importer-distributors have been severely damaged or eliminated from the markets, concentration has been increased in those markets, and a tendency towards monopoly has been created," Metro has made the minimal allegations about the impact on competition in the United States necessary to state a claim for a Sherman Act violation. We have jurisdiction to review Metro's claims, and examine Sammi's alleged conduct under the rule of reason.
 
 
 42
 III. Metro Cannot Show a Substantial Anticompetitive Effect in the United States or Antitrust Injury
 
 
 43
 Under the rule of reason, a plaintiff must establish "antitrust injury," that is, that the conduct at issue actually caused "injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged." Austin v. McNamara, 979 F.2d 728 (9th Cir.1992). Because Metro relies almost entirely on a per se argument, it points to little evidence of the impact of the Korean registration system on competition in the United States. It merely suggests that it could present evidence of "the harm and consequent damage to Metro and its customers" and "the harm to Vollrath and its customers stemming from Vollrath's withdrawal from the market." In responding to a motion for summary judgment, however, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. "[T]he record must be sufficient to 'lead a rational trier of fact to find for the non-moving party.' " City of Vernon v. Southern California Edison Co., 955 F.2d 1361, 1369 (9th Cir.1992) (quoting Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356), cert. denied, 506 U.S. 908, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992). We conclude that under the Vollrath record, a rational trier of fact could not find in favor of Metro on its Sherman Act claim.
 
 
 44
 To show an injury to competition, the plaintiff ordinarily "must delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly." Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1413 (9th Cir.), cert. denied, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991). However, if a plaintiff can show "that the restraint has actually produced significant anti-competitive effects, such as a reduction in output," "a formal market analysis becomes unnecessary." Id. Nonetheless, while "conduct that eliminates rivals reduces competition," "reduction of competition does not invoke the Sherman Act until it harms consumer welfare." Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1433 (9th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995).
 
 
 45
 Metro has produced no evidence of actual injury to competition in the United States. Rather, based on its own conclusion that the relevant market consists only of stainless steel steamers, it asserts that Sammi has a monopoly in that market and that output would only be reduced in the United States if Sammi chose to do so. The delays in Metro's and Vollrath's receipt of steamers are insufficient to show an injury to competition and consumers. Though Metro alleges that Vollrath was forced out of the steamer market as a result of Sammi's actions, Metro has produced no evidence of reduced output or increased prices. Metro merely relied on the Vollrath record and speculated that it could provide direct evidence of injury to competition in the future. These assertions are insufficient to satisfy Matsushita 's requirement that Metro come forward with specific facts supporting its claims of injury to competition when responding to a motion for summary judgment.
 
 
 46
 The Vollrath record demonstrates that Metro cannot make the more-commonly utilized circumstantial showing of a negative impact on competition because the record insufficiently establishes a relevant market. In Vollrath, we found it "highly doubtful that stainless steel steamers constituted a relevant market." 9 F.3d at 1462.
 
 
 47
 Vollrath's expert testified that these steamers could be treated as a product distinct from other steamers, such as those made from aluminum or other materials, and "in a sense" could be viewed as constituting "a market of their own." This is hardly a firm conclusion of a separate market for stainless steel steamers. Furthermore, even this inconclusive opinion was not reasonably based on sound data. There was no detailed examination of market data or any analysis of cost, comparable usage, or comparative features of other competing products. The opinion was based on limited anecdotal evidence.
 
 
 48
 Id. Thus, we concluded as a matter of law that "[t]here was insufficient evidence [in the Vollrath record] concerning the relevant product and geographic market and Sammi's economic power in that market." Id.
 
 
 49
 The identical record is before us in the case at bar, Metro having based its opposition to Sammi's motion for summary judgment on the Vollrath record alone. Collateral estoppel does not bar Metro from relitigating the issue of the relevant market addressed in Vollrath; though they shared the same attorney, Metro and Vollrath, as competitors, were not in privity. See Shaw v. Hahn, 56 F.3d 1128, 1131 (9th Cir.) ("The doctrine of issue preclusion, of course, cannot be applied against a litigant who was not a party to or in privity with a party to the prior proceeding."), cert. denied, --- U.S. ----, 116 S.Ct. 418, 133 L.Ed.2d 336 (1995).[6] However, because the facts of this case are identical to and indistinguishable from the facts of Vollrath, we follow Vollrath and conclude that Metro has not presented sufficient evidence from which a rational finder of fact could conclude that Sammi had market power in a relevant market. Thus, a finder of fact could not conclude that the Korean registration system had a negative impact on competition or consumer welfare in the United States, so Metro cannot show that it has suffered an antitrust injury. Consequently, Metro cannot recover for any alleged violation of § 1 of the Sherman Act by Sammi. The district court properly granted Sammi's motion for summary judgment on all of Metro's claims, and properly denied Metro's cross-motion.
 
 CONCLUSION
 
 50
 For the reasons stated above, we AFFIRM the district court's grant of summary judgment in favor of Sammi, and AFFIRM the district court's denial of Metro's cross-motion for summary judgment.
 
 
 
 [1]
 We also affirmed the district court's holding that there could be no anti-competitive conspiracy among Sammi and its subsidiaries because of their common ownership, and the district court's holding that there was no violation of the California Unfair Trade Practices Act. Id. at 1463-64
 
 
 [2]
 This was the same theory that we declined to consider in Vollrath because it had not been raised before the district court in Vollrath
 
 
 [3]
 The 1990 amendments only increased the penalty provisions of § 1, and did not change the language quoted above
 
 
 [4]
 See also Power East Ltd. v. Transamerica Delaval, Inc., 558 F.Supp. 47, 49 (S.D.N.Y.) (holding that plaintiff could not bring Sherman Act claim where the activities forming the basis of the claim were "centered, and have their effect, solely outside United States' commerce"), aff'd without opinion, 742 F.2d 1439 (2d Cir.1983); United States v. Westinghouse Elec. Corp., 471 F.Supp. 532, 542 (N.D.Cal.1978) ("United States antitrust laws are implicated only where the actual or intended effect of a foreign transaction is sufficiently large to cause a cognizable injury to United States commerce."), aff'd, 648 F.2d 642 (9th Cir.1981)
 
 
 [5]
 A foreign country's allowing or even encouraging particular conduct which is prohibited in the United States no longer provides a sufficient basis for finding a conflict between foreign and domestic law. Where a party does not claim that the foreign country's "law requires them to act in some fashion prohibited by the United States ... or claim that their compliance with the laws of both countries is otherwise impossible," there is no conflict between the domestic and foreign law. Hartford Fire Ins., 509 U.S. at 799, 113 S.Ct. at 2911 (reviewing a Ninth Circuit decision in which we applied Timberlane I to foreign conduct but found no comity defense). While Hartford Fire Ins. overruled our holding in Timberlane II that a foreign government's encouragement of conduct which the United States prohibits would amount to a conflict of law, it did not question the propriety of the jurisdictional rule of reason or the seven comity factors set forth in Timberlane I
 
 
 [6]
 The fact that Vollrath and Metro shared a common attorney and argued similar theories of liability is not sufficient to demonstrate privity between the two parties. See, e.g., Benson and Ford, Inc. v. Wanda Petroleum Co., 833 F.2d 1172, 1175 (5th Cir.1987) ("A plaintiff cannot be precluded from bringing his own suit because he chose an attorney who participated in a prior suit."); Freeman v. Lester Coggins Trucking, Inc., 771 F.2d 860, 864 (5th Cir.1985) ("[F]or parties to be so 'closely aligned,' or that the party's representation in the first suit 'adequately' represents the non-party's interests in the first suit so as to preclude a nonparty in subsequent litigation, requires more than a showing of parallel interests or, even, a use of the same attorney in both suits.")